849 A.2d 451

**William LeJEUNE**

v.

**COIN ACCEPTORS, INC.**

**No. 111, Sept. Term, 2003.**

Court of Appeals of Maryland.

May 13, 2004.

292

David A. Flores (Harmon & Davies, P.C., Lancaster, PA; Ann M. Grillo of Tydings & Rosenberg, Baltimore), all on brief, for Appellant.

Christine B. Cesare (Bryan Cave LLP; Peter F. Axelrad of Council, Baradel, Kosmer & Nolan, P.A., Annapolis; Mark S. Deiermann and Daniel M. O'Keefe of Bryan Cave LLP, St. Louis, MO), all on brief, for Appellee.

Argued Before Bell, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, Judge.

This case of first impression involves the provisions of the Maryland Uniform Trade Secrets Act, codified under Maryland Code, Sections 11–1201 through 11–1209 of the Commercial Law Article (1975, 2000 Repl.Vol.). William LeJeune appeals from a preliminary injunction issued by the Circuit Court for Anne Arundel County, enjoining him from working for Mars Electronics, Inc. (hereinafter "Mars") in a number of specified industries. The Circuit Court found that, if LeJeune were permitted to work in those industries, his former employer and Mars' principal competitor, Coin Acceptors, Inc. (hereinafter "Coinco"), would suffer irreparable injury because LeJeune had misappropriated trade secrets that would give Mars an unfair competitive advantage. We conclude that the evidence supports a finding of trade secret misappropriation. We also conclude, however, that the Circuit Court erred in relying on the theory of "inevitable disclosure" when ruling on the preliminary injunction. Therefore, we vacate the injunction and remand this case to the Circuit Court for further proceedings consistent with this Opinion.

## I. Background

### A. Facts

Coinco is a Missouri corporation in the business of designing, manufacturing, and servicing coin acceptors, coin changers, bill validators, and similar machines. Coinco divides its

efforts to market and sell these machines into three separate "channels": "Vending," which includes beverage bottlers such as Coke and Pepsi; "Amusement," which includes video game manufacturers and distributors; and "Specialty Markets," which includes transit or transportation companies or companies that offer "self-check-out" services.

LeJeune began his employment with Coinco in 1993 as a "Sales and Field Service Representative." While in this position, he sold currency equipment, performed field service on that equipment, and led seminars on the repair and maintenance of Coinco's machines. In 1997, LeJeune was promoted to the position of Branch Manager and became responsible for managing every aspect of the Baltimore branch office, including the sales and field service of Coinco vending equipment in Maryland, Virginia, Delaware and West Virginia. LeJeune's job title changed again to Area Account Manager in 2002, when Coinco restructured its operations, eliminating the position of Branch Manager and creating three new positions: Area Account Manager (hereinafter "AAM"), Service Center Manager, and Customer Service Representative. As an AAM, LeJeune continued to be responsible for sales of Coinco's vending products but in an expanded region.[1]

In January of 2003, Coinco introduced the MC2600 bill acceptor, a new product in the Amusement Market. Although LeJeune traditionally sold vending products, Coinco assigned him the responsibility of marketing and selling the MC2600 because many of the amusement customers were also Coinco's vending customers. LeJeune, however, never sold a single MC2600 in the Amusement Market and, actually, approached only one amusement industry customer to sell that product.

Coinco selected LeJeune in 2002 and 2003 to serve on a team of Coinco employees charged with investigating ways the company could cultivate clients in the Specialty Markets channel. LeJeune, the only AAM selected, attended the team's

---

1. Service Center Managers manage the service of Coinco's equipment for its customers, and the Customer Service Representatives provide additional customer support to Coinco customers.

initial meeting, after which he was told by Coinco leadership to focus his work on the Vending Market and not to let his work on the Specialty Markets team interfere with that focus. LeJeune did not attend any subsequent meetings of the Specialty Markets team. Ultimately, the team generated a strategic plan, which analyzed the Specialty Markets and Coinco's opportunities in those markets. LeJeune received a copy of the plan, but he never reviewed it in detail.

While employed with Coinco, LeJeune never entered into a non-compete or confidentiality agreement with Coinco. He worked in sales and was not involved in manufacturing or research and development. He did, however, develop an extensive understanding of Coinco's products through his service and sales experience. He also learned of Coinco's pricing, pricing strategies, marketing and business initiatives, and selling strategies but was not privy to all information relating to Coinco's contracts with customers. LeJeune worked from his home in Annapolis, where he regularly received company documents.

Considering new employment in May and June of 2003, LeJeune had several interviews with Mars, Coinco's primary competitor in the currency acceptor industry. During an introductory telephone interview in May 2003, LeJeune described his work experience with Coinco and mentioned to the interviewer, Chris Mumford, that "Coinco [had] recently added Money Controls products to [its] portfolio to call on retail/kiosk accounts east of the Mississippi." He also stated that Coinco was concerned that Conlux, a sister company of Mars, was cutting into Coinco's sales. LeJeune later traveled to Lancaster, Pennsylvania, where he interviewed with several other Mars personnel. LeJeune discussed his experience at Coinco and explained why he sought employment with Mars. One of the interviewers, Mary Rampe, twice explained to LeJeune that no confidential Coinco information should be discussed during the interview. On July 7, 2003, LeJeune signed a job-offer letter from Mars and accepted a position as an Amusement OEM (Original Equipment Manufacturer) Manager. The new position would require LeJeune to focus

on selling to the amusement industry, although he would have some contact with "full line distributors" that serve both the amusement and vending markets.

On July 14, 2003, LeJeune informed his supervisor, William Morgan, that he was leaving Coinco to work for Mars. On July 16, 2003, Morgan and LeJeune met for several hours to review the status of LeJeune's accounts. Morgan asked LeJeune to continue to work for Coinco for two weeks so that LeJeune could introduce Coinco's clients to LeJeune's successor. During his conversations with Morgan, LeJeune stated that he would be in a "unique" position at Mars because of his experience at Coinco. Morgan understood this to mean that LeJeune intended to use his knowledge of Coinco's business strategies. LeJeune stated that the reference to his "unique" position described his situation as one with extensive experience in the vending industry entering a job with a focus on the amusement market. That same day, LeJeune returned his laptop computer to Morgan along with a box of Coinco documents and materials.

Prior to this meeting with Morgan, LeJeune, on three separate occasions, had transferred or "burned" digital copies of numerous documents from his Coinco laptop to a compact disc ("CD"). On July 8, LeJeune copied, among other documents, Coinco's Executable Budgeting Software, which includes Coinco's manufacturing costs and profit margins. LeJeune conducted a second "burn" on July 8, transferring numerous personal files that had been saved on the Coinco laptop. On July 16, LeJeune again copied various files from the laptop, one of which contained pricing information related to Coinco's Specialty Markets Strategic Plan. Sometime after copying all of the files onto the CD, LeJeune created a second copy of the disc.

LeJeune explained that he had done this because he wanted to retain personal files, such as wedding photographs, that had been saved under the "My Documents" file on the laptop. He stated that, for the sake of simplicity and because he did not know how to save individual files onto a CD, he had "burned"

the entire "My Documents" folder and captured some of Coinco's business documents. LeJeune stated that he had not saved any Coinco documents with the intent to use those documents in his work with Mars. An expert in computer forensics testifying on behalf of Coinco, however, stated that, when LeJeune copied the Executable Budgeting Software, that file was not part of the "My Documents" folder. The expert also discovered that LeJeune had erased information from the Coinco laptop in an effort to hide the downloads. The erased information was recovered by computer forensic specialists.

In addition to the computer files, LeJeune also retained hard copies of a number of other Coinco documents. Included among those documents were Coinco's price and cost information, Coinco's service pricing, a list of Coinco's preferred distributors, and detailed technical specifications relating to a Coinco's amusement product, the MC2600, and a Coinco vending product, the Bill Pro Validator. The pricing and cost information is sensitive because Coinco uses a tiered-pricing system.

Coinco's efforts to maintain the confidentiality of company information included limiting access to company documents to only personnel who needed to know the information. To this end, Coinco guarded the computer files on its mainframe computer with a password system, which allowed Coinco to control the employees' access to company information. Coinco also negotiates "non-disclosure" agreements with many of its clients to ensure that those clients do not share pricing information with other Coinco customers or Coinco competitors. In addition, Coinco's "Employee Handbook" states that its business methods are "proprietary," and employees should protect such information as confidential. Many of Coinco's pricing documents and other strategic information, including information at issue in this case (i.e., the Specialty Markets Strategic Plan, pricing and cost documents, and Bill Pro Validator specifications), were marked "confidential."

LeJeune stated that he did not discuss proprietary Coinco information, such as Coinco's price list, customer list, or strategic plan, with anyone at Mars. According to LeJeune, he did not know that Coinco was concerned about his knowledge of confidential information until he learned of Coinco's suit against him, at which time he returned all of the alleged confidential Coinco documents and files.

## B. Procedural History

On July 24, 2003, in the Circuit Court for Anne Arundel County, Coinco filed a Complaint for Injunctive and Other Relief and a Motion for a Temporary Restraining Order against LeJeune. Coinco claimed that it was entitled to injunctive relief under Section 11–1202(a) of Maryland Uniform Trade Secrets Act[2] because LeJeune had misappropriated Coinco's trade secrets. On the next day, the Circuit Court granted the Temporary Restraining Order, which, pending the outcome of Coinco's Motion for a Preliminary Injunction, prohibited LeJeune from working for Mars in the "Vending Industry, Amusement Industry, and/or the Specialty Markets Industries."

Over a period of three non-consecutive days in August and September of 2003, the Circuit Court held a hearing on Coinco's Motion for a Preliminary Injunction, after which the trial judge issued his ruling from the bench. He concluded that Coinco had presented sufficient evidence that it would succeed on the merits of its case against LeJeune. In particular, the judge found that it was likely that Coinco would be able to establish at trial that LeJeune had possession of Coinco's "technical information" and "overall strategy" that qualified as trade secrets under the Maryland Uniform Trade Secrets Act. He also found that, for the purpose of a preliminary injunction, Coinco had presented sufficient evidence that the trade secrets had been misappropriated when LeJeune downloaded Coinco's business documents. The trial judge

---

**2.** Section 11–1202(a) of the Maryland Uniform Trade Secrets Act states: "Actual or threatened misappropriation may be enjoined."

additionally found that, "with the knowledge [LeJeune] has, it would be inconceivable ... how he could do his job as [Mars's] national accounts representative for the amusement industry without considering or weighing ... the information that he acquired while he was employed with Coinco...."

In balancing the injuries that would result from granting or denying the injunction, the trial judge stated that Coinco would "suffer a greater harm" if the injunction were denied because Mars could "basically ... lock[ ] [Coinco] out of the market" and gain "an unfair competitive advantage." As a result of Mars's advantage, the trial judge found, Coinco would be "irreparably harmed and there will be no ... monetary value... that will fairly compensate" Coinco for its injuries. Finding further that the public interest would not be harmed by the proposed preliminary injunction, the Circuit Court, therefore, granted Coinco's motion and, in a written order dated September 5, 2003, stated:

William LeJeune ... is hereby enjoined from using or disclosing any of Coinco's confidential and trade secret information; and it is further ordered that William LeJeune be and is hereby enjoined from competing against Coinco by working for Mars in any area in which he would have to use or disclose Coinco's confidential and trade secret information—including specifically the Vending Industry, Amusement Industry, and/or the Specialty Markets Industries, and also including, specifically, as Mars's National Accounts Representative for the Amusement Industry.... [T]his Preliminary Injunction shall remain in effect until the trial on the merits in this proceeding, to be scheduled by the Court.

LeJeune appealed the Circuit Court's order, and this Court, acting on its own initiative, issued a writ of certiorari. *Le-Jeune v. Coin Acceptors*, 379 Md. 224, 841 A.2d 339 (2004). LeJeune presents several questions for review, which we have rephrased for clarity:

1. Under the Maryland Uniform Trade Secrets Act, did LeJeune misappropriate Coinco's trade secrets when, after

resigning, he retained Coinco's documents, including its price lists, customer lists, budgeting software, and product specifications?

2. Under the Maryland Uniform Trade Secrets Act, should LeJeune be enjoined from working in the Vending, Amusement, and Specialty Markets because he would inevitably disclose knowledge of Coinco's trade secrets to Mars?

3. Did the Circuit Court abuse its discretion in concluding that Coinco would suffer irreparable harm unless LeJeune was enjoined from working in the specified industries?

4. Was the Circuit Court's preliminary injunction overbroad?

We hold that the evidence supports the Circuit Court's finding that LeJeune misappropriated Coinco's trade secrets. We further hold that the Circuit Court erred in relying on the theory of "inevitable disclosure," which does not apply in Maryland. Moreover, because the decision to grant the preliminary injunction was based on this error of law, we vacate the Circuit Court's order and remand the case for further proceedings.

## II. Standard of Review

Our review of a preliminary injunction is "limited" because "we do not now finally determine the merits" of the parties' arguments. *Dep't of Transportation v. Armacost,* 299 Md. 392, 404, 474 A.2d 191, 197 (1984). Rather, we ordinarily determine whether the trial judge exercised sound discretion in examining the four factors that must be found in order to issue the preliminary injunction. *Lerner v. Lerner,* 306 Md. 771, 776, 511 A.2d 501, 504 (1986) (quoting *State Dep't of Health and Mental Hygiene v. Baltimore County,* 281 Md. 548, 554, 383 A.2d 51, 55 (1977)). We referred to those four factors in *Fogle v. H & G Restaurant, Inc.,* 337 Md. 441, 654 A.2d 449 (1995):

As a general rule, the appropriateness of granting an interlocutory injunction is determined by examining four factors: (1) the likelihood that the plaintiff will succeed on the

merits; (2) the "balance of convenience" determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest.

*Id.* at 455–56, 654 A.2d at 456 (quoting *Armacost,* 299 Md. at 404–05, 474 A.2d at 197). In examining irreparable injury, the Circuit Court may consider "the necessity to maintain the status quo" pending a final outcome. *Lerner,* 306 Md. at 776, 511 A.2d at 504 (quoting *State Dep't of Health and Mental Hygiene,* 281 Md. at 554, 383 A.2d at 55). An appellate court ordinarily will not disturb a preliminary injunction on appeal unless the trial court committed an abuse of discretion. *See Maryland Comm'n on Human Relations v. Downey Communications, Inc.,* 110 Md.App. 493, 521, 678 A.2d 55, 69 (1996). Nonetheless, "even with respect to a discretionary matter, a trial court must exercise its discretion in accordance with correct legal standards." *Alston v. Alston,* 331 Md. 496, 504, 629 A.2d 70, 74 (1993).

## III. Discussion

### A. Maryland Uniform Trade Secrets Act

Coinco brought its cause of action under the Maryland Uniform Trade Secrets Act, which provides the statutory remedies for a business alleging misappropriation of a trade secret. "Misappropriation" means the:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

1. Derived from or through a person who had utilized improper means to acquire it;

2. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

3. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Section 11–1201(c) of the Commercial Law Article. Under the Maryland Uniform Trade Secrets Act, the term "trade secret" means:

information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Section 11–1201(e) of the Commercial Law Article.

Long before the enactment of the Maryland Uniform Trade Secrets Act in 1989, Maryland and other jurisdictions within and outside the United States had regulated the protection of trade secrets. *See* MILTON E. BABIRAK, JR., *The Maryland Uniform Trade Secrets Act: A Critical Summary of the Act and Case Law*, 31 U. BALT. L.REV. 181, 183 (2002) (hereinafter *"Babirak "*). One scholar has submitted that, even under Roman law, a businessperson had a cause of action against a competitor who enticed the businessperson's slave to divulge confidential business information. *Id.* (citing A. ARTHUR SCHILLER, *Trade Secrets and the Roman Law: The Actio Servi Corrupti*, 30 COLUM. L.REV. 837, 838 n. 5 (1930)). At least since 1837, when the court in *Vickery v. Welch*, 36 Mass.

523 (1837) ordered the seller of a chocolate mill not to disclose his secret chocolate-making formula to anyone other than the buyer of the mill, courts in the United States have taken action to protect the secrecy of a type of confidential business information called "trade secrets." *See Babirak* at 184.

In 1922, this Court decided *Fulton Grand Laundry Co. v. Johnson,* 140 Md. 359, 117 A. 753 (1922), possibly the first published Maryland case involving alleged trade secrets. In that case, the Court held that a former employee of a laundry company could use a list of the company's clients to start his own business. *Id.* at 362, 117 A. at 754. The customer list, the court concluded, should not be "classed as a trade secret" because it was "susceptible of discovery by observation [and] open to the observation of any one who thinks it worth while to observe." *Id.* at 361, 117 A. at 753.

The modern development of trade secret law took a significant step when, in 1939, the drafters of the first Restatement of the Law of Torts included a definition of a trade secret. Comment b of Section 757(b) of the Restatement of the Law of Torts states:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

The Restatement also proposed six factors for a court to consider in determining whether information should be protected as a trade secret:

(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty

with which the information could be properly acquired or duplicated by others.

This definition of trade secret gained wide acceptance during the mid-twentieth century as the number of trade secret cases grew and courts around the country began to adopt the Restatement version. *Babirak* at 187. We embraced the Restatement's definition of a trade secret as well as its proposed factors in *Space Aero Products Co., Inc. v. R.E. Darling Co., Inc.*, 238 Md. 93, 105, 208 A.2d 74, 79, *cert. denied*, 382 U.S. 843, 86 S.Ct. 77, 15 L.Ed.2d 83 (1965).

In 1979, the United States National Conference of Commissioners on Uniform State Laws adopted the Uniform Trade Secrets Act (hereinafter the "Uniform Act"), which proposed a definition of a trade secret based in large measure on the Restatement. UNIF. TRADE SECRETS ACT, 14 U.L.A. 437 commissioners' prefatory note, 439 (1990). The Uniform Act also defined "misappropriation" and provided for damages and injunctive relief in the event a trade secret had been misappropriated. *Id.* at 438, 449, 455. Soon after its adoption, many states began to recognize the Uniform Act as the model for legislating trade secret protection. *Babirak* at 188.

When the Maryland Uniform Trade Secrets Act took effect on July 1, 1989, Maryland became the twenty-ninth state to adopt some version of the Uniform Act. Maryland Laws ch. 598 (1989); NOTE, PETER B. SWANN, *Maryland Uniform Trade Secrets Act*, 49 MD. L.REV. 1056 (1990)(hereinafter "*Swann* "). Presently, forty-two of the fifty states and the District of Columbia have enacted some form of the Uniform Act. *Babirak* at 182 and 188 n. 60. The substantive provisions of the Maryland Uniform Trade Secrets Act depart only slightly from the Uniform Act in that Maryland's version "may [not] be applied or construed to waive or limit any common law or statutory defense or immunity possessed by State personnel as defined under [the Maryland Tort Claims Act]." Section 11–1207(b)(2) of the Maryland Uniform Trade Secrets Act [3];

---

3. Section 11–1207(b)(2) states: "Nothing contained in this act may be applied or construed to waive or limit any common law or statutory

*see Swann* at 1056 n. 2. With a few enumerated exceptions not relevant here, the Maryland Uniform Trade Secrets Act currently provides the exclusive civil remedy for misappropriation of a trade secret, "displac[ing] conflicting tort, restitutionary, and other law of this State" that provides civil remedies for such conduct. Section 11–1207(a) of the Maryland Uniform Trade Secrets Act.[4]

Section 11–1202(a) sets forth the operative language for injunctive relief under the Maryland Uniform Trade Secrets Act. It states plainly that the "[a]ctual or threatened misappropriation" of a trade secret "may be enjoined." A claim under the Maryland Uniform Trade Secrets Act, therefore, raises two central inquiries: (1) whether the information at issue qualifies as a trade secret; and (2) whether an individual has actually misappropriated that information or has threatened to misappropriate it.

The Circuit Court in the case *sub judice* invoked its equity powers under Section 11–1202(a) of the Maryland Uniform Trade Secrets Act to enjoin LeJeune from working for Mars in the Vending, Amusement, or Specialty Markets channels. LeJeune contends that the Circuit Court erred in issuing the injunction because the documents and files at issue were not trade secrets under the Maryland Uniform Trade Secrets Act and because he did not "misappropriate" any of that information.

---

defense or immunity possessed by State personnel as defined under § 12–101 of the State Government Article." The Uniform Act does not contain such a provision.

4. Section 11–1207(a) states: "Except as provided in subsection (b) of this section, this subtitle displaces conflicting tort, restitutionary, and other law of this State providing civil remedies for misappropriation of a trade secret." The exceptions provided in subsection (b) include:
(i) Contractual remedies, whether or not based upon misappropriation of a trade secret;
(ii) Other civil remedies that are not based upon misappropriation of a trade secret; or
(iii) Criminal remedies, whether or not based upon misappropriation of a trade secret.

## 1. Coinco's Trade Secrets

We begin by examining whether the alleged trade secrets in this case qualify as such under the Maryland Uniform Trade Secrets Act (hereinafter "MUTSA"). LeJeune posits that Coinco failed to make reasonable efforts to protect the secrecy of its information; therefore, according to LeJeune, the documents and information that he retained do not qualify as trade secrets. On the other hand, Coinco alleges that numerous computer files and documents that LeJeune had in his possession were confidential, proprietary items that meet the definition of "trade secrets." In particular, Coinco complains that, of the computer files taken by LeJeune, the Executable Budgeting Software and Special Markets Strategic Marketing Plan were trade secrets. Coinco also claims that LeJeune retained trade secrets in hard-copy form, including pricing and cost information, service pricing information, a list of preferred distributors, and specifications of the MC2600 and Bill Pro Validator.

Section 11–1201(e) of MUTSA defines the term "trade secret" to mean:

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Section 11–1201(e) of MUTSA.

Although we have not had occasion to interpret this definition, the Court of Special Appeals has done so in a case where a printing company alleged that its pricing information and marketing strategies qualified for trade secret protection. In *Optic Graphics, Inc. v. Agee*, 87 Md.App. 770, 591 A.2d 578, *cert. denied*, 324 Md. 658, 598 A.2d 465 (1991), the court held that the pricing information or market strategies did not meet

the statutory definition of a trade secrets. The court observed that "[t]here are two types of trade secrets: technological developments and internal operating information." *Id.* at 784, 591 A.2d at 585. Obviously dealing with "internal operating information," the court recognized that, under some circumstances, pricing information and marketing strategies could be considered trade secrets. *Id.* at 787, 591 A.2d at 586. Nevertheless, the court stressed, information is a trade secret under MUTSA only if two requirements are met: "the information must (1) hold 'independent economic value' because it is not 'generally known' to or readily ascertainable by others who stand to benefit economically if they use or disclose it, and (2) be the subject of reasonable efforts to maintain its secrecy." *Id.* at 787, 591 A.2d at 587. The Court of Special Appeals agreed with the trial court that the pricing information and marketing strategies failed both requirements. The pricing information had no "economic value" to the competitor because it was composed of so many variables, generally subject to change, and specific to the printing company. The printing company's efforts to maintain the secrecy of the pricing information also "fell short" of MUTSA's requirement. *Id.* at 787–88, 591 A.2d at 587. The marketing strategies also failed the "trade secret" definition because they, too, were subject to change and, given that they were readily available from the marketplace, had not been reasonably safeguarded. *Id.* at 788, 591 A.2d at 587.[5]

---

**5.** On one other occasion, the Court of Special Appeals considered MUTSA's definition of a trade secret, but in a vastly different context. In *Bond v. PolyCycle, Inc.*, 127 Md.App. 365, 732 A.2d 970 (1999), the Court of Special Appeals held that a company's chemical engineering technology met the statutory definition. PolyCycle's former engineer, Bond, who had improved the company's machine that separated paint adherent from plastic, left the company and took all of the technology with him. He argued that the technology did not qualify as a trade secret because "the components of the machine are all available on the open market" and the general technology is "widely known in the plastics industry." *Id.* at 374, 732 A.2d at 974. The court rejected these arguments and held that the improved technology was a trade secret. *Id.* at 372–73, 732 A.2d at 973–74. As to Bond's first argument, the court stated that, no matter the availability of the component parts, it was the "secret formula" of combining those parts that qualified as

In *Diamond v. T. Rowe Price Assocs.*, 852 F.Supp. 372 (D.Md.1994), Judge Benson E. Legg of the United States District Court for the District of Maryland also determined that certain internal operating information did not qualify for trade secret protection under MUTSA. T. Rowe Price, an investment management firm, sought relief under MUTSA against a manager who had allegedly misappropriated files that she had acquired during her time as an employee. Judge Legg found that almost all of the documents at issue were "either outdated (e.g., interoffice memoranda), innocuous (e.g., routine correspondence), or publicly available (e.g., SEC filings such as Form K–1s)." *Id.* at 412. With respect to the other documents, which contained general business matters, the tax withholding status and investment structure of a mutual fund, and "an analyst's cursory analysis of a sneaker company," the Judge determined that "there is no evidence that they have any independent economic value for anyone" other than T. Rowe Price. *Id.*

In *Motor City Bagels v. American Bagel Co.*, 50 F.Supp.2d 460 (D.Md.1999), however, Judge Frederic N. Smalkin found that a company's business plan was a trade secret. Judge Smalkin summarized MUTSA's definition: "Stated succinctly, 'to be protected under Maryland law, information must be secret, and its value must derive from the secrecy. In addition, the owner of the information must use reasonable efforts to safeguard the confidentiality of the information.'" *Id.* at 478 (quoting *Montgomery County Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 878 F.Supp. 804, 814 (D.Md.1995), *aff'd*, 91 F.3d 132 (4th Cir.1996) (holding that a realtor association's computer database was not a "trade secret" because the information contained on it had been "distributed widely to its realtor members and potential purchasers")). Although the business plan at issue contained some public information,

---

the trade secret. *Id.* at 375, 732 A.2d at 975. Regarding Bond's second argument, the court held that the engineering process, although similar to other technology, was still PolyCycle's trade secret because Bond had developed it while acting as the company's agent and by using the company's funds. *Id.* at 376, 732 A.2d at 975–76.

Judge Smalkin distinguished it from publicly available marketing strategies in *Optic Graphics* because the business plan included "personal insights and analysis brought to bear through diligent research and by marshaling a large volume of information." *Id.* at 479.

Judge Deborah K. Chasanow reached a similar conclusion with regard to the mutual fund customer list at issue in *Padco Advisors, Inc. v. Omdahl,* 179 F.Supp.2d 600 (D.Md.2002). As a Regional Sales Manager for Padco Advisors, Omdahl was responsible for marketing and selling mutual funds to customers in the western United States. When Omdahl left Padco to work for ProFund, one of Padco's two competitors, Padco sought relief under MUTSA to protect its customer database. Padco's customers were registered individual investment advisors ("RIAs"), and the database contained information about each RIA's "investment strategy, total assets he manages, where the assets are invested, and the type of portfolio management software used." *Id.* at 604. In denying Omdahl's motion for summary judgment, Judge Chasanow held that certain information on the database was not ascertainable by competitors and that the information had economic value because it could help ProFund develop new products. *Id.* at 610. Judge Chasanow also concluded that Padco had taken reasonable steps to guard the secrecy of the database by making it available to only 15% of its employees and by protecting the database with passwords and "firewalls." *Id.* Thus, for the purposes of surviving summary judgment, the database met the statutory definition of trade secret.

 The case before us resembles the situations in *Motor City Bagels* and *Padco.* Similar to the companies in those cases that sought to protect collections of valuable data, Coinco had compiled in its Executable Budgeting Software, Specialty Markets Strategic Plan, and hard-copy pricing documents a vast amount of information related to its manufacturing costs and profit margins. Moreover, like the mutual fund market in *Padco* in which only three companies competed, the currency acceptor industry is highly competitive and dominat-

ed by only two companies. Therefore, Coinco's cost and profit information, if available to Mars, could allow Mars to undercut all of Coinco's prices, giving Mars an easy economic advantage. Because of the unique, competitive nature of the currency acceptor industry, the detailed specifications of the MC2600 and Bill Pro Validator also had economic value to Mars. Should Mars learn the technology used in those machines, it could apply that technology to improve the commercial value of its own products.

██ We have identified no evidence suggesting that Mars, without spending a great deal of resources, could obtain all of this information from the marketplace. Indeed, Coinco is a privately held company and does not release its profit information in public filings with the Securities and Exchange Commission. The evidence supports a finding that the information contained in the computer files and hard-copy documents (i.e., the budgeting software, Specialty Markets Strategic Plan, pricing and cost documents, and MC2600 and Bill Pro Validator specifications) [6] had economic value to Mars and was not "readily ascertainable."

██ Furthermore, it is apparent from the record that Coinco took reasonable measures to maintain the secrecy of the pricing and cost information, Specialty Markets Strategic Plan, and machine specifications. Because of its tiered pricing scheme, Coinco negotiated non-disclosure agreements with its customers to prevent them from discussing prices with other customers. In addition, Coinco marked "confidential" on the specifications for the Bill Pro Validator as well as the Specialty Markets Strategic Plan and other pricing documents that LeJeune either burned or kept in hard copy form. In the company's employee handbook, Coinco communicated the se-

---

6. The evidence does not support a finding that Coinco's preferred distributor list had any economic value to Mars. That document only identifies twenty-one distributors of the MC2600 that Coinco characterizes as "preferred." It does not contain price or cost information or technical information. It is not likely that Mars would have to make much of an effort to learn from another source, such as the marketplace, the identity of these relatively few distributors.

cret nature of its manufacturing processes and business methods by requiring employees to protect such information as confidential. In light of these efforts, we hold that the trial court appropriately determined that the specifications of the MC2600 and Bill Pro Validator as well as the pricing and cost data contained on the Specialty Markets Strategic Plan, Executable Budgeting Software, and other hard-copy pricing documents qualify as trade secrets under MUTSA.

## 2. Misappropriation

Coinco is not entitled to injunctive relief unless it has established that LeJeune misappropriated its trade secrets, including Coinco's Executable Budgeting Software, Specialty Markets Strategic Plan, hard-copy pricing and cost lists, and specifications of the MC2600 and Bill Pro Validator. LeJeune contends that the only basis for granting an injunction under MUTSA is a finding of "actual or threatened" misappropriation. The evidence admitted at the preliminary injunction hearing, LeJeune argues, does not establish any "actual or threatened" misappropriation of a trade secret. LeJeune maintains that he did not acquire any information improperly because Coinco voluntarily provided him with all retained documents and then did not ask for their return until the start of this litigation. Additionally, LeJeune argues that Coinco did not present any evidence that he had used or disclosed trade secrets or that he intended to do so.

In response, Coinco urges that the evidence does support a finding that LeJeune misappropriated trade secrets. Coinco also claims that the evidence demonstrates that LeJeune misappropriated this information by copying selected confidential files from the Coinco laptop onto a CD and by retaining hard-copy documents after allegedly telling Coinco that he had returned everything.

As we stated above, because this Court has not before considered a claimed violation of MUTSA, whether there has been a misappropriation is a question of first impression.

Section 11–1201(c) of MUTSA defines "misappropriation" as follows:

"Misappropriation" means the:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

1. Derived from or through a person who had utilized improper means to acquire it;

2. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

3. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Section 12–1201(c) of MUTSA. This section describes two general types of misappropriation: (1) acquisition of a trade secret by improper means or (2) disclosure of a trade secret. We must consider this definition in conjunction with the terms of Section 11–1202(a) of MUTSA, which provides an injunction for "actual" or "threatened" misappropriation. A court, therefore, can issue an injunction to prevent either of the following: (1) the actual or threatened acquisition of a trade secret by improper means or (2) the actual or threatened disclosure of a trade secret.[7]

---

7. Coinco also argues that LeJeune threatened misappropriation of trade secrets under the theory of "inevitable disclosure." As discussed in Part B, *infra,* we disagree that this type of analysis should apply.

### a. Acquisition of a Trade Secret by Improper Means

 The Circuit Court was persuaded that the evidence was sufficient that LeJeune had acquired trade secrets by improper means. Both parties agree that LeJeune possessed documents and files belonging to Coinco, and we determined that several of these documents (i.e., the budgeting software, Specialty Markets Strategic Plan, pricing and cost documents, and MC2600 and Bill Pro Validator specifications) qualified as trade secrets. MUTSA states that a trade secret is acquired by "improper means" when it has been acquired by "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means." Section 11–1201(b) of MUTSA.

The Court of Special Appeals' opinion in *Bond v. PolyCycle*, 127 Md.App. 365, 732 A.2d 970 (1999) is instructive here. Bond, the former engineer of a plastic recycling company, on the evening prior to resigning, "took all of the work product that he had done in the preceding two years on improving [the company's technology], placed it on a floppy disc, [and] then erased it from the company computers." *Id.* at 377, 732 A.2d at 976. Because this technology was a trade secret belonging to the company, Bond did not have authority to take it. The court concluded, "Without authority from PolyCycle, [Bond's] taking of its computer files relating to the process constitutes theft, and therefore a misappropriation under [MUTSA]." *Id.* at 379, 732 A.2d at 977.

The engineer's acquisition of the technology in *Bond* occurred under circumstances similar to those before us in the present case. When Bond took the technology from PolyCycle and erased it from the company's computers, he took possession of trade secrets without the company's authorization. Similarly, Coinco did not give LeJeune permission to transfer trade secrets from the company laptop to a CD. In an attempt to justify his actions, LeJeune stated that he transferred the "My Documents" folder from the company laptop to retain personal files, such as wedding photographs, and in the process, captured numerous Coinco documents.

Coinco's expert testified, however, that LeJeune did not download only the "My Documents" folder, but he also transferred selected, specific Coinco files containing trade secrets. Considering this evidence, the trial judge apparently did not believe LeJeune's version of the events, and we see no reason here to upset the fact-finder's credibility determination.

LeJeune argues that he did not acquire the trade secrets improperly because Coinco provided the documents and had no procedure in place for collecting them after an employee left the company. In support of this contention, LeJeune relies on *Diamond*, 852 F.Supp. at 412, in which the defendant, after she left her employment, retained certain company files and documents that the company had sent to her home. The company, T. Rowe Price, argued that this conduct amounted to misappropriation under MUTSA, but the court disagreed, holding that the files did not constitute trade secrets. *Id.* at 412. Judge Legg noted that, even if trade secrets were at issue, "T. Rowe Price allowed [the defendant] to work at home, regularly sent documents to her home, and cannot now complain that her possession of these documents violates [MUTSA]." *Id.* at 412 n. 193.

LeJeune's argument misses the mark because the circumstances in *Diamond* differ from those in the present case. In this case, unlike in *Diamond*, the trial court found and we agree that the information at issue is sensitive trade secret information. Moreover, LeJeune did not merely hold on to documents that had been sent to his home and then refuse to return them, as was the case in *Diamond*. Rather, on the last day of his employment, LeJeune selected specific, confidential Coinco documents and actively transferred them from the Coinco laptop to a CD that he intended to keep for his personal use. After transferring the files, LeJeune then erased over four hundred files from the laptop. This suggests that LeJeune was attempting to hide his conduct and was aware that transferring the files was improper. LeJeune again demonstrated an intent to hide his possession of trade secrets when he told his supervisor that "everything" had been returned, although numerous hard-copy trade secrets

remained in LeJeune's possession. The evidence in this case is sufficient to support the Circuit Court's finding that LeJeune acquired Coinco's trade secrets by improper means.

### b. Inevitable Disclosure / Threatened Disclosure

Concluding that LeJeune misappropriated trade secrets by acquiring them improperly does not end our inquiry with respect to whether the Circuit Court's injunction was appropriate in this case. Injunctive relief, by its nature, addresses only what could happen in the future and cannot remedy misconduct, such as the improper acquisition of trade secrets, that occurred in the past. In fact, the injunctive remedies of Section 11–1202(a) of MUTSA provide no remedy at all for the past misappropriations. In other words, if LeJeune already had misappropriated the trade secrets and returned them, the court cannot craft a injunction to reverse time and erase whatever harm LeJeune caused by taking the trade secrets without consent.

Nevertheless, MUTSA's injunctive remedies could serve to protect Coinco if the evidence demonstrates a likelihood of some *future* misappropriation. As we stated previously, MUTSA permits a court to enjoin either (1) actual or threatened acquisition of a trade secret by improper means or (2) actual or threatened disclosure of trade secrets. With respect to the first category, the evidence clearly is insufficient to support a finding that LeJeune continues to acquire trade secrets improperly or that he has threatened other acquisition of Coinco's trade secrets by improper means. As to the second category, the record does not reveal any evidence that LeJeune actually had disclosed Coinco's trade secrets and that an injunction is necessary to stop that conduct. The sole question in the case at bar, therefore, is whether any threatened future disclosure or use of a trade secret justifies an injunction at this stage of the proceedings.[8]

---

8. We have identified some evidence in the record suggesting that LeJeune has threatened disclosure of Coinco's trade secrets. When LeJeune met with his supervisor after announcing his resignation, he

The Circuit Court, however, did not make a finding of "threatened disclosure" of Coinco's trade secrets. Rather, it decided to issue the preliminary injunction based on a theory known as "inevitable disclosure." In making its ruling, the trial judge stated:

> I know I don't have to make a final ruling on whether the inevitable disclosure doctrine applies or not, but it is the court's position that with the knowledge that [LeJeune] has, it would be inconceivable to the court how he could do his job as the national accounts representative for the amusement industry without considering or weighing or taking into consideration the information that he acquired while he was employed with Coinco, and so for that reason, I do believe ... that [Coinco] will suffer irreparable injury.

The theory of "inevitable disclosure" has been applied in courts outside of Maryland to enjoin a departing employee from working for a competitor when the court is persuaded that it is inevitable that the departed employee will use or disclose trade secrets in his or her work for the competitor.

---

mentioned that he would be in a "unique" position at Mars, suggesting that he might use confidential Coinco information in his new employment. This comment raises suspicion particularly because, as we determined above, LeJeune had acquired trade secrets improperly by copying Coinco files onto his CD and by saving certain hard-copy trade secrets after he informed his supervisor "everything" had been returned. *See Ackerman v. Kimball International, Inc.*, 652 N.E.2d 507, 510–11 (Ind.1995) (upholding the trial court's finding that the defendant's "pre-departure harvesting" of the plaintiff's "proprietary information" suggested a threat of misappropriation). Further evidence of LeJeune's threatened disclosure comes from the discovery that not only did he burn one CD, but he also placed Coinco trade secrets on a second CD. If there is a second CD filled with trade secrets, it would come as no surprise that LeJeune had made a third or fourth CD to maintain for future reference. Even LeJeune's interview with Mars indicates his willingness to share trade secrets. When interviewing face-to-face with Mars personnel, he was reminded twice that confidential information should not be disclosed. One could infer from these reminders that LeJeune, in fact, had displayed some propensity to disclose trade secrets. Based on this evidence, we hold that Coinco will likely succeed on the merits of its claim of threatened misappropriation by disclosure of trade secrets.

*Babirak* at 198. Put another way, "inevitable disclosure" cases

> are so named because they are based on the original employer's claim that a former employee who is permitted to work for a competitor will—even if acting in the utmost good faith—inevitably be required to use or disclose the former employer's trade secrets in order to perform the new job.

LAWRENCE I. WEINSTEIN, *Revisiting the Inevitability Doctrine: When Can a Former Employee Who Had Never Signed a Non-compete Agreement nor Threatened to Use or Disclose Trade Secrets Be Prohibited from Working for a Competitor?*, 21 AM. J. TRIAL ADVOC. 211, 212 (1997) (hereinafter *"Weinstein"*). Another commentator explained that the doctrine arises often when the former employee did not sign a non-compete agreement:

> Significantly, the inevitable disclosure doctrine is utilized in cases where the employee has not signed, or has even refused to sign, a non-competition agreement or non-disclosure of proprietary information agreement with his prior employer, and where the employee has not threatened, directly or indirectly, to use or disclose the trade secrets of his former employer to his new employer.

*Babirak* at 198.

LeJeune claims that, because this Court has not recognized the theory of "inevitable disclosure," the Circuit Court erred in using it as a ground for issuing the preliminary injunction limiting his employment at Mars. LeJeune argues, however, that, even if this Court decides to adopt "inevitable disclosure," it should not be applied to his case. According to LeJeune, any trade secrets that LeJeune may have acquired while working in the Vending Channel at Coinco would not be useful to him while working in the Amusement Channel at Mars. Disclosure of the vending trade secrets, therefore, is not inevitable in LeJeune's opinion.

██ According to Coinco, however, "inevitable disclosure," although not expressly recognized in Maryland, was correctly

applied in this case because it is a form of "threatened" misappropriation under MUTSA. Coinco claims that LeJeune inevitably would disclose his extensive knowledge about Coinco's business strategies while working for Mars, giving his new employer an unfair competitive advantage. This is so, in Coinco's view, because LeJeune has demonstrated a lack of candor and a willingness to use or disclose trade secrets. Coinco believes, therefore, that the theory of "inevitable disclosure" is appropriate in this case because LeJeune understands Coinco's strategic plan for the Amusement Channel, the market on which he would focus at Mars as a National Accounts Representative for the Amusement Industry. We disagree with Coinco and decline to adopt the theory of "inevitable disclosure" under the present circumstances.

Long before the adoption of the Uniform Act, the first reported cases applying "inevitable disclosure" involved extraordinary situations in which a company tried to guard the secrecy of some technology that had propelled the company into industry leadership. *See Allis–Chalmers Manufacturing Co. v. Continental Aviation & Engineering Corp.*, 255 F.Supp. 645 (E.D.Mich.1966); *E.I. duPont de Nemours & Co. v. American Potash & Chemical Corp.*, 200 A.2d 428 (Del.Ch.1964); *B.F. Goodrich Co. v. Wohlgemuth*, 117 Ohio App. 493, 192 N.E.2d 99 (1963);[9] *see also Weinstein* at 223.

---

**9.** In *B.F. Goodrich Co. v. Wohlgemuth*, 117 Ohio App. 493, 192 N.E.2d 99 (1963), the court affirmed an injunction prohibiting a former employee of B.F. Goodrich, the first space-suit manufacturer, from working for a competitor on space-suit projects. The court held that the former employee's intimate knowledge of trade secrets provided him the opportunity to use and disclose those secrets in his work for the competitor, whose technology lagged behind B.F. Goodrich's. *Id.* at 103–04. Similarly, *E.I. duPont de Nemours & Co. v. American Potash & Chemical Corp.*, 200 A.2d 428 (Del.Ch.1964), involved a scientist who had worked extensively to develop the pigment manufacturing process for duPont, a leader in that industry, and then left to join a competitor. Despite a lack of evidence of threatened disclosure or bad faith, the court held that there was sufficient evidence that the scientist inevitably would use or disclose duPont's trade secrets in his work with the competitor. The court in *Allis–Chalmers Manufacturing Co. v. Continental Aviation & Engineering Corp.*, 255 F.Supp. 645 (E.D.Mich.1966) issued an injunction under almost the same circumstances. The defen-

Since the Uniform Act's adoption and widespread recognition by the states, the most notable case involving "inevitable disclosure" is *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995). In that case, PepsiCo sought to enjoin one of its former senior executives, Redmond, from working for Quaker Oats Company, PepsiCo's rival in the sports beverage market. *Id.* at 1264. While at PepsiCo, Redmond had access to confidential marketing strategies and "pricing architecture." *Id.* at 1265. Redmond continued to work for PepsiCo while he secretly negotiated for employment with Quaker. Redmond accepted a senior sales position at Quaker and, when he informed PepsiCo of that decision, misrepresented the nature of his new position. *Id.* PepsiCo sued and obtained a preliminary injunction, barring Redmond from "assuming any duties with Quaker relating to beverage pricing, marketing, and distribution." *Id.* at 1263.

On appeal before the Seventh Circuit, PepsiCo argued that Redmond would "inevitably disclose" trade secrets acquired at PepsiCo because, at Quaker, he would be involved significantly in the marketing, pricing, and distribution of sports beverages. *Id.* at 1266. The court of appeals agreed, affirming the injunction and holding that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Id.* at 1269. The appellate court accepted the district court's reasoning that "unless Redmond possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [Quaker's beverages] by relying on his knowledge of [PepsiCo's] trade secrets." *Id.*

---

dant, in his work in the Allis–Chalmers fuel systems laboratory, had been "intimately connected" with the development of technology that only a few companies had commercialized. *Id.* at 650. A competitor that had not commercialized the technology hired the defendant, and Allis–Chalmers sued for an injunction. Holding that it was "virtual[ly] impossib[le]" that the defendant could work for the competitor without giving it the "benefit" of Allis–Chalmers' trade secrets, the court issued an injunction that prohibited the defendant from working on fuel systems projects altogether. *Id.* at 654.

No court interpreting the provisions of MUTSA has applied the theory of "inevitable disclosure." *See Padco Advisors,* 179 F.Supp.2d at 611 ("The doctrine of inevitable disclosure has not been expressly adopted by the Maryland state courts."). Among other courts, including those interpreting other versions of the Uniform Act, the theory remains the subject of considerable disagreement. *Compare Whyte v. Schlage Lock Co.,* 101 Cal.App.4th 1443, 125 Cal.Rptr.2d 277 (2002) (rejecting the "inevitable disclosure" doctrine after surveying the cases that have considered the theory), *Del Monte Fresh Produce Co. v. Dole Food Co.,* 148 F.Supp.2d 1326 (S.D.Fla. 2001) (same), *Bayer Corp. v. Roche Molecular Systems, Inc.,* 72 F.Supp.2d 1111 (N.D.Cal.1999) (same), *and EarthWeb, Inc. v. Schlack,* 71 F.Supp.2d 299 (S.D.N.Y.1999) *with Strata Marketing, Inc. v. Murphy,* 317 Ill.App.3d 1054, 251 Ill.Dec. 595, 740 N.E.2d 1166 (2000), *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995), *Merck & Co., Inc. v. Lyon,* 941 F.Supp. 1443 (M.D.N.C.1996), *and Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405 (N.D.Iowa 1996); *see also* Comment, *An Overview of Individual States' Application of Inevitable Disclosure: Concrete Doctrine or Equitable Tool?,* 55 SMU L. REV. 621 (2002); *Babirak* at 198–99 (stating that courts do not agree about the application of "inevitable disclosure").

The court in *Whyte v. Schlage Lock Co.,* 101 Cal.App.4th 1443, 125 Cal.Rptr.2d 277 (2002) recently presented a comprehensive discussion of the theory within the context of California law. Schlage Lock Company competed with Kwikset Corporation in the business of manufacturing and selling locks and related products to retailers. *Id.* at 1447, 125 Cal.Rptr.2d 277. The Home Depot, one of the largest retailers of these products, accounted for a large percentage of Schlage's sales. As Schlage's vice-president of sales, Whyte was responsible for sales to several large retailers, including The Home Depot. *Id.* Although Whyte had signed a confidentiality agreement as to Schlage's proprietary information, he had not signed a covenant not to compete. Whyte was lured to join Kwikset, and Schlage sued, seeking an injunction based on the theory of inevitable disclosure. *Id.* at 1448, 125 Cal.Rptr.2d 277. After

surveying the cases that have considered the doctrine, the court opted to join those jurisdictions that have rejected it:

> The decisions rejecting the inevitable disclosure doctrine correctly balance competing public policies of employee mobility and protection of trade secrets. The inevitable disclosure doctrine permits an employer to enjoin the former employee without proof of the employee's actual or threatened use of trade secrets based upon an inference (based in turn upon circumstantial evidence) that the employee will use his or her knowledge of those trade secrets in the new employment. *The result is not merely an injunction against the use of trade secrets, but an injunction restricting employment.*

*Id.* at 1461–62, 125 Cal.Rptr.2d 277 (emphasis added). The application of the doctrine, the court stated, " 'creates a de facto covenant not to compete' and 'runs counter to the strong public policy in California favoring employee mobility.' " *Id.* at 1462, 125 Cal.Rptr.2d 277 (quoting *Bayer Corp.,* 72 F.Supp.2d at 1120). The court continued:

> The chief ill in the covenant not to compete imposed by the inevitable disclosure doctrine is in its after-the-fact nature: The covenant is imposed *after* the employment contract is made and therefore alters the employment relationship without the employee's consent. When, as here, a confidentiality agreement is in place, the inevitable disclosure doctrine "in effect convert[s] the confidentiality agreement into such a covenant [not to compete]." Or, as another federal court put it, "a court should not allow a plaintiff to use inevitable disclosure as an after-the-fact noncompete agreement to enjoin an employee from working for the employer of his or her choice."

*Id.* at 1462–63, 125 Cal.Rptr.2d 277 (citations omitted); *see also EarthWeb,* 71 F.Supp.2d at 311 ("[S]uch retroactive alterations [as a result of applying inevitable disclosure] distort the terms of the employment relationship and upset the balance which courts have attempted to achieve in construing noncompete agreements."). The court was disturbed that the inevitable disclosure doctrine could "rewrite[ ] the employment

agreement" by providing the employer with "the benefit of a contractual provision it did not pay for, while the employee is bound by a court-imposed contract provision with no opportunity to negotiate terms or consideration." *Id.* at 1463, 125 Cal.Rptr.2d 277.

We find this reasoning persuasive, especially as applied to the circumstances in the case before us. Maryland has a policy in favor of employee mobility similar to that of California. *See Becker v. Bailey,* 268 Md. 93, 299 A.2d 835 (1973); *Tawney v. Mutual System of Maryland, Inc.,* 186 Md. 508, 47 A.2d 372 (1946). Furthermore, Coinco decided not to enter into a confidentiality agreement or a covenant not to compete with LeJeune. To recognize "inevitable disclosure" in this case would allow Coinco the benefit of influencing LeJeune's employment relationship with Mars even though Coinco chose not to negotiate a restrictive covenant or confidentiality agreement with LeJeune. *See International Business Mach. Corp. v. Seagate Technology, Inc.,* 941 F.Supp. 98, 101 (D.Minn.1992) ("A claim of trade secret misappropriation should not act as an ex post facto covenant not to compete."). Adopting the theory also would tend to permit a court to infer some inevitable disclosure of trade secrets merely from an individual's exposure to them. *See H & R Block Eastern Tax Servs. Inc. v. Enchura,* 122 F.Supp.2d 1067, 1076 (W.D.Mo.2000) (stating that no inference of inevitable disclosure can flow from exposure to trade secrets). For these reasons, we conclude that the theory of "inevitable disclosure" cannot serve as a basis for granting a plaintiff injunctive relief under MUTSA.

## B. Irreparable Harm and the Breadth of the Preliminary Injunction

LeJeune's final arguments challenge the Circuit Court's use of discretion in determining irreparable harm to Coinco and by fashioning the preliminary injunction. The Circuit Court made its determination of irreparable harm based on the inapplicable theory of "inevitable disclosure." The trial judge found that Coinco would suffer irreparable harm if LeJeune were permitted to work as a national accounts representative

at Mars because "it would be inconceivable ... how he could do [the job] without considering or weighing" Coinco's trade secrets. Based on this reasoning, the Circuit Court issued its preliminary injunction, barring LeJeune from "working for Mars in any area in which he would have to use or disclose Coinco's confidential and trade secret information—including specifically the Vending Industry, Amusement Industry, and/or the Specialty Markets Industries, and also including, specifically, as Mars' National Accounts Representative for the Amusement Industry."

The analysis underlying the injunction relies on the assumption that LeJeune's exposure to trade secrets will cause those secrets to be "inevitably disclosed" by virtue of the new employment with a competitor. As a result, the Circuit Court's order "is not merely an injunction against the use of trade secrets, but an injunction restricting employment." *Whyte*, 101 Cal.App.4th at 1462, 125 Cal.Rptr.2d 277. Because "inevitable disclosure" does not apply, the trial court was wrong to issue the injunction limiting the scope of LeJeune's employment with Mars. Rather, the focus should be on precluding the disclosure of trade secrets.

*PRELIMINARY INJUNCTION VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.*