# CIRCUIT COURT OF CHESTERFIELD COUNTY

MeadWestvaco Corp.

v.

Aaron Bates

August 1, 2013

Case No. CL13-1589

By Judge Harold W. Burgess, Jr.

This matter came before the court on June 20, 2013, for a hearing on MeadWestvaco Corporation's Motion for Temporary Injunction. I took the motion for injunction under advisement and granted Defendant, Aaron Bates, leave to respond to the affidavit of Teresa Gran by affidavit, and Plaintiff, MeadWestvaco Corporation, leave to respond to Defendant's Memorandum of Law in Opposition to Motion for Temporary Injunction. During the course of the hearing, I also denied Plaintiff's motion for a protective order with respect to the possible introduction of confidential information and took Defendant's Motion To Dismiss the Motion for Temporary Injunction under advisement. Mr. Cosby raised two additional procedural arguments at the conclusion of the hearing, and I granted

Plaintiff leave to address those arguments in its reply brief as well. After studying the memoranda in detail, reviewing the pertinent case law, and examining the exhibits submitted in this case, I am prepared to rule on the Motion for Preliminary Injunction.

## I. *Background*

MeadWestvaco Corporation (hereinafter "MWV" or "Plaintiff") is a global packaging provider that designs and manufactures packaging products for various industries, with a significant part of its business focused on food and beverage packaging. Hr'g. Tr. 8-10, June 20, 2013. Aaron Bates (hereinafter "Bates" or "Defendant") began working for MWV's predecessor, The Mead Corporation (hereinafter "Mead"), in 1991 as a co-op student in the Packaging Division and remained an employee of Mead and MWV for twenty-two years until his resignation on May 30, 2013. Hr'g. Tr. 101; Hebert Aff. 1.

While working for Mead and MWV, Bates entered into several confidentiality agreements, of which the 1992 Restrictive Covenants Agreement (hereinafter the "1992 Agreement") and the 2012 Stock Option Awards and the Restrictive Stock Unit Awards (hereinafter the "2012 Stock Award Agreements" (collectively)) are at issue in the current litigation. Hebert Aff. 2. Under the 1992 Agreement, the article titled Proprietary and Confidential Information states in part:

> [Bates] acknowledges that, during the term of his employment by MEAD, [Bates] may acquire, have access to, develop, and be entrusted with knowledge of trade secrets and confidential and proprietary information regarding, among other things, MEAD's past, present, and future operations, its customers and suppliers, pricing and marketing strategies, product designs, developments, specifications and other technical data, and the methods used worldwide by MEAD and its employees. . . . [Bates] hereby agrees that he . . . shall not directly or indirectly use, other than for MEAD's benefit, or disclose any Trade Secret, as defined hereinafter, that [Bates] may have acquired or acquire during the term of his employment by MEAD for so long as such information remains a Trade Secret. [Bates] acknowledges that he has access to information and Trade Secrets of MEAD which, if disclosed, may cause great injury to MEAD's technology base.
>
> In addition . . . [Bates] agrees that for a period of two (2) years after the cessation of his employment with MEAD, [Bates] . . . shall not directly or indirectly use or disclose, any Confidential or Proprietary Information . . . that [Bates] may

acquire . . . during the term of, in the course of, or as a result of his employment by MEAD.

1992 Restrictive Covenants Agreement, Art. 1. Article 2 of the 1992 Agreement, titled Limited Non-Compete, sets forth an acknowledgement and agreement "that it would be virtually impossible for [Bates] to work in a similar capacity for a Competing Business without disclosing Propriety Information of MEAD." *Id.* at Art. 2. The Article goes on to state that "[Bates] shall not during [Bates] employment with MEAD and for a period of two years thereafter, engage in any activities as an employee which may be substantially similar to [his duties as a MEAD employee][1] for the benefit of those businesses in competition with MEAD involving paperboard packaging products or packaging machinery." *Id.* Exhibit B to the 1992 Agreement identifies the businesses in competition with Mead in the evolving paperboard packaging industry as Riverwood International, Inc., and Jefferson Smurfit Corporation. 1992 Restrictive Covenants Agreement, Ex. B. The 1992 Agreement defines the term Competing Business as "any business which is the same as or essentially the same as the business of MEAD." *Id.* at E. The 1992 Agreement also includes an article imposing a two year limitation for non-solicitation of other Mead employees and an article requiring the return of Mead property.

The 2012 Stock Award Agreements contain Confidentiality, Non-Solicitation, and Non-Competition covenants. These covenants confirm Bates' acknowledgement and agreement as an employee of MWV and its affiliates and thereafter "to hold in strictest confidence, and not to use, any Confidential Information, except for the benefit of [MWV], and not to disclose any Confidential Information to any person or entity without written authorization of [MWV]." MeadWestvaco Corp. Stock Option Awards (for 2012), Ex. A; MeadWestvaco Corp. Restricted Stock Unit Awards (for 2012) (Service-Based), Ex. A. The Non-Solicitation covenant implements a one year period following cessation of employment with MWV during which Bates will not "solicit, hire, or attempt to hire any employ of [MWV] or any of its affiliates," or "solicit, or do business with, or attempt to solicit or do business with, any customer for whom (MWV) or any of its affiliates provided (or actively sought to provide) goods or services within twelve months prior to [Bates'] date of termination for the purpose of providing such customer with services or products competitive with those offered by [MWV] or any of its affiliates." MeadWestvaco Corp. Stock Option Awards (for 2012), Ex. A; MeadWestvaco Corp. Restricted Stock Unit Awards (for

---

[1] Exhibit A to the 1992 Agreement identifies Bates' duties with Mead to include "the technical duties and functions, including but not limited to evaluation, research, formulation, design, and documentation, with or without computer aids, necessary for proper and efficient carton and machine design, manufacture, distribution, service, and operation." 1992 Restrictive Covenants Agreement 1 Ex. A, Duties Description.

2012) (Service-Based), Ex. A. Finally, the Non-Competition covenant sets forth an agreement and acknowledgement that:

> [D]uring [Bates'] employment with [MWV] and its affiliates and during the Restricted Period, [the twelve month period following Bates' termination of employment for any reason], [Bates] will not, without [MWV's] express written consent, anywhere in the world where [MWV] or its affiliates do business, directly or indirectly, own, maintain, finance, operate, invest, or engage in any business that competes with the business of [MWV] and its affiliates in which [Bates] was materially involved during the two years prior to [his] termination; or provide services, as an employee, consultant, independent contractor, agent or otherwise, to any business that competes with [MWV] and its affiliates in business in which [Bates] was materially involved during two years prior to [his] termination.

MeadWestvaco Corp. stock Option awards (for 2012), Ex. A; MeadWestvaco Corp. Restricted Stock Unit Awards (for 2012) (Service-Based), Ex. A.

MWV is a direct, global competitor with Graphic Packaging International (hereinafter "GPI") in many of the same markets, including the food and beverage packaging markets. Hr'g. Tr. 9-10; Martin Aff. 2-3. As two of the main players in the packaging industry, MWV and GPI invest significant time and money into innovation and product design to maintain and expand their customer base. Hr'g. Tr. 37; Martin Aff. 2-3. MWV and GPI also fabricate machines for secondary packaging, machines customers use to fill bottles or containers (the primary packaging) with the food or beverage products. Martin Aff. 3. When Bates resigned from MWV, he informed the Vice President, Strategy, Marketing, and Design, and the Global HR Director for Healthcare, Innovation, and Design that he was considering three outstanding job offers, one of which was the position of Vice President of Global Designs at GPI. Hebert Aff. 3. MWV expressed a desire to match GPI's offer, but, after taking some time to think about it, Bates later confirmed his resignation. *Id.* Following his departure from MWV, Bates accepted GPI's offer and reported to his new position on June 18, 2013. Bates Aff. 1.

During his tenure with Mead and MWV, Bates gradually rose through the ranks, and, with his ascension up the corporate ladder, came greater access to confidential information. Hebert Aff. 1-2; Martin Aff. 4-9. At the time of his resignation, Bates held the position of Senior Director of Global Production Design, the highest level design position at the company. Martin Aff. 3. Prior to that, he held the position of Director of Global Design and Packaging Development for the beverage division. *Id.* at 3-4. David Martin, the Vice President of Innovation for the beverage business at MWV, who

worked closely with Bates at times, testified that, in this capacity, "[Bates] was responsible for leading and managing the design efforts within North America." Hr'g. Tr. 11. The evidence shows that Bates worked with Martin roughly 1-5% of the time but that there were other instances of communication such as email threads, sidebar conversation, and run-ins in the hallway. Hr'g. Tr. 11; Bates Aff. 3.

MWV alleges that Bates' responsibilities at MWV included:

> leading, managing, and guiding resources through all phases of the design process, including the product designs themselves[;] interacting with customers and suppliers on design related issues[;] leveraging designs and design information initially developed for one end product with products from other market segments[;] developing strategic account plans for key customers and delivering proposals to them[;] overseeing the work product of design managers, designers, and associate designers in the design process and otherwise directing design teams[;] managing project scheduling, budgeting processes, and providing monthly reports to effectively track project resourcing and productivity[;] working with MWV Strategic Business Units, Innovation teams, and Manufacturing team in the development and launch of new products and improvements[; and] working with the MWV Intellectual Property team to build, maintain, and defend MWV's intellectual property portfolio.

Martin Aff. 4. Bates was a member of both the corporate innovation team and the beverage innovation team, which met every other week and once a month, respectively, and collaborated through email threads. Hr'g. Tr. 12, 15. The innovation teams would address product initiatives for marketplace strategies and customer specific planning activities. *Id.* at 14. Confidential information was routinely discussed at these meetings because the members sought to formulate market and customer strategy, and that often included educated assumptions about competitors' strategies. *Id.* at 12-14, 22-24; Martin Aff. 6.

According to MWV these responsibilities gave Bates access to MWV trade secrets and confidential information. Specifically, Bates' interactions with customers gave him insight into their current and future packaging needs, and the MWV product development trials that followed, and led to his involvement in bid proposals. Martin Aff. at 5. Bates' position on the Beverage Innovation team exposed him to confidential information related to MWV's competitive strategies and projects in the product pipeline. *Id.* at 6. MWV also argues that Bates' role on the intellectual property team included the evaluation of MWV patents, some of which he was responsible for developing, to design steps to minimize competitive strategies intended

to circumvent patented material. *Id.* at 7; Hr'g. Tr. 38. Bates' work also put him in position to know the capabilities of MWV's machines to produce product lines and MWV's failed design efforts, which provide valuable insight into design dead-ends. Martin Aff. 8-9.

Bates presents a different account of his responsibilities while employed at MWV. He asserts that his role at MWV focused on physical design, design ideas, and organization. Bates Aff. 2. He notes that, while the list of job functions to the 1992 Agreement identifies duties necessary for proper distribution of cartons and machines and duties for evaluation and research for carton and machine design, he was never involved in these aspects while working for MWV. *Id.* at 2-3; see Hr'g. Tr. 65. The manufacture and operations teams handled the distribution of MWV packages, and Bates had no involvement with, nor did he manage, this area of MWV business. Hr'g. Tr. 66. Furthermore, he did not set business strategies or customer pricing, and, contrary to the evidence presented by Martin, was not involved in strategic planning, tactical action, and operation decision making of the business unit, and had limited customer interaction. *Id.* at 3-4.

Bates testified that his role with the beverage and food strategic units did not involve developing strategic account plans for customers. *Id.* at 6. Rather, design was reactionary to the strategic account plans crafted by other teams. According to Bates, MWV package designs are defined by the needs of the customers and the design team was tasked with producing an output based off of those needs. Hr'g. Tr. 63. As a MWV employee, Bates had conversations with his design staff about the differences between MWV products and GPI products and how MWV could develop superior designs to those of GPI. Hr'g. Tr. 88-89.

Bates claims that his knowledge of MWV machinery is equivalent to the information available to the public on the company's website, that he had little involvement with trade secret protected technology, that he was not involved with the development of instant price quotes, that he was never asked to craft a global competitive design strategy, and that his management responsibility was not global but rather involved only the United States. *Id.* at 5-7; see Hr'g. Tr. 67.

Bates assumed his new position, Vice President of Global Designs, with GPI on June 18, 2013. Bates Aff. 1, 5; Hebert Aff. 3. According to his testimony, Bates will be responsible for leading and shaping the global design organization within the company. Hr'g. Tr. 68. This will include forming third-party relationships with outside design firms, universities, and technology companies. Bates Aff. 3. Bates will not design packages or engage in technical design, documentation, research, or formulation, nor will he have any involvement with corporate strategies, pricing, customer contracts, or investments. Hr'g. Tr. 68, 71; Bates Aff. 3. Rather, Bates will assume a more managerial role, supervising the supervisors of the designers and making sure the processes of the design are followed, i.e. making

sure the inputs match the outputs. *Id.* at 68, 81, 95. During his testimony, Bates acknowledged that, as part of his work with GPI, particularly when supervising the design processes, he might oversee design work for customers he did work for while an MWV employee. Hr'g. Tr. 82.

On cross-examination Bates testified that, from the time he was in discussion with GPI to the date of his resignation, roughly six weeks, he continued to work at MWV performing his normal routine. Hr'g. Tr. 75. Although he was in discussion with GPI regarding this new employment, he did not accept the position until the day he resigned. Hr'g. Tr. 78. During this time period, he was tasked to evaluate a GPI product and identify MWV's options for an alternative, as evidenced by an email, Plaintiff's Ex. 3, he received with a request for urgent support on the matter and for a response that same day. *Id.* at 76-78. Bates confirmed that he never responded to this request. *Id.* at 78. Bates' testimony on cross-examination also revealed that, while he rarely attended monthly meetings with MWV client Coca-Cola, as recent as July 2012, he traveled to the United Kingdom to meet with this customer with the ultimate goal of obtaining more business. Hr'g. Tr. 79-81.

Plaintiff's counsel presented Bates with a May 21, 2013, MWV email, on which he was copied, concerning a client's interest in adding a specific feature to its design, and a series of emails from Monika Eiden dated May 15, 2013, May 21, 2013, and May 23, 2013, informing Bates that Human Resources did not receive a signed Intellectual Property agreement from him and requesting he sign and return one promptly. Hr'g. Tr. 83-86; see Plaintiff's Ex. 4; Plaintiff's Ex. 5. Bates testified that he signed an earlier version of the agreement, but that he did not sign this agreement because of concern regarding some of the language contained therein, a matter he brought to the attention of his supervisor, Todd Fister. Hr'g. Tr. 88.

Bates testified that, in his position with GPI, he will consult with design staff to identify differences between MWV and GPI products, and how GPI could design superior designs to those of MWV, one of the same design functions he engaged in when assessing MWV and GPI products on behalf of MWV. Hr'g. Tr. 88-89; He acknowledged that this function is intended to develop newer products that are superior to those of MWV and that he knows what MWV has in its pipeline, which could cover anywhere from one to three years. Hr.'g. Tr. 89-90.

Finally, Bates testified that he has not disclosed any trade secrets or confidential information, that he has not been asked to do so, and that he has no intention to do so. Hr'g. Tr. 63-64; Bates Aff. I. He testified that he can perform the duties of his new position without disclosing MWV trade secrets and that he disagrees with any assertion to the contrary. *Id.* at 64; Bates Aff. 1-2.

While MWV did not present evidence that Bates has actually disclosed trade secrets or confidential information,[1] it contends that Bates' position with GPI violates the non-compete clauses of the 1992 Agreement and the 2012 Stock Award Agreements and that he will be unable to avoid using the confidential knowledge acquired from MWV in his position as Vice President of Global Designs, causing MWV irreparable harm. As such, MWV filed suit and the motion for temporary injunction presently before the court.

## II. *Procedural Matters*

### A. *Objection to Venue*

At the conclusion of the June 20, 2013, hearing, defense counsel raised an oral objection to venue. In a supplemental filing, Bates, citing § 8.01-261(15) of the Code of Virginia, which states in part that, in proceedings seeking an injunction, "venue shall be in the circuit court of the county or city in which the act is to be done, or being done, or is apprehended to be done or the proceeding is pending," claims that, if any act related to the misappropriation of trade secrets does occur, it will occur in Georgia, not Virginia. Va. Code Ann. § 8.01-261(15)(c). Bates does not identify the appropriate venue in which this matter should be heard or request that the matter be transferred. Rather, Bates requests that the court find venue to be improper and thus deny MWV's motion.

Bates' objection focuses on the claim for misappropriation of trade secrets, but he overlooks the two counts for breach of contract of the restrictive covenants. These claims allege that Bates and MWV[2] entered into non-compete agreements, with one of them entered into within the geographic boundaries of Virginia, that Bates later accepted employment with a direct competitor of MWV while he was a resident of Chesterfield County, and that this is a violation of the non-compete agreement. Thus, before the court are allegations of acts, breach of contract claims, done in Chesterfield County, and a proceeding that seeks an injunction filed therein. Pursuant to § 8.01-261, "if more than one preferred place of venue applies, any such place shall be a proper forum." Va. Code Ann. § 8.01-261.

As to proper venue for a proceeding for injunction based on an alleged misappropriation of trade secrets, both parties address the notion that § 8.01-261 applies only to a pure bill of injunction; meaning "a bill which has no other object than an injunction." *Winston v. Midlothian Coal Mining Co.*, 61 Va. (20 Gratt.) 686, 690 (1871). In *Winston*, the Supreme Court

---

[1]  Martin testified that he did not have any knowledge that Bates had used or disclosed any confidential information. Hr'g. Tr. 29-30.

[2]  The 1992 Agreement was entered into by Bates and Mead, a predecessor to MWV.

of Virginia declined to apply the venue statute for injunctions when the request for injunction "was merely ancillary to the other and principal relief prayed for." *Id.* Similarly, the Circuit Court of the City of Roanoke in *Argos Utilities Corp. v. Perrin*, 83 Va. Cir. 344 (Roanoke 2011), declined to apply § 8.01-261(15)(c) because "[Plaintiff sought] substantial compensatory and punitive damages; the prayer for prohibitory injunction, contained in a single sentence at the end of the amended complaint, is at best secondary and subordinate. The amended complaint in this case is not a pure bill of injunction." *Id.* at 352.

In his argument, Bates mischaracterizes the *Winston* and *Argos Utilities* opinions as holding that a bill in which plaintiff seeks injunction, among other relief, is a pure bill of injunction unless the request for injunction is ancillary or secondary to the other relief requested.

"MWV's suit for an injunction is hardly 'secondary' or 'subordinate' to the other relief requested. . . . Clearly, the Complaint is overwhelmingly directed to claims for injunctive relief; it is MWV's claim for $150,000 in compensatory damages, 'punitive damages', [sic] a violation of the Va. Computer Crimes Act, and attorneys' fees that are secondary or subordinate to the violations deserving injunctive relief that it must prove." Defendant's Additional Objections to the Plaintiff's Motion for Preliminary Injunction, as noted at the conclusion of the hearing before the Court, § A, ¶ 8.

Rather, the opinions hold that the mere inclusion of a prayer for injunctive relief does not amount to a pure bill of injunction; to find otherwise would effectively empower parties to utilize. Category A, or preferred, venue to forum shop. *Winston*, 61 Va. (20 Gratt.) at 690.

MWV's Complaint for Injunctive Relief and Damages prays for temporary and permanent injunctive relief, actual and compensatory damages in the amount of $150,000.00, punitive damages in the amount of $350,000.00, attorneys' fees and costs, and such other relief as is allowed by law. Although injunctive relief is the central relief sought in the complaint, the foregoing analysis compels the court to find that the Complaint is not a pure bill of injunction because it is not "a bill which has no other object than an injunction." *Id.*

## B. *No Rule 4:15 Violation*

In further support of his opposition to the motion for injunctive relief, Bates claims that notice did not include a certification "that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action." Va. Sup. Ct. R. 4:15(b).

Responding to this point, MWV asserts that Bates waived this objection by filing a brief in opposition, citing *Hutchison v. Hagadone*, 78 Va. Cir. 185 (Loudoun 2009). However, MWV's contention that Hutchison found that the plaintiff had waived any arguments or objection under Rule 4:15

by filing an opposition is incorrect. Rather, the court held that, by filing an opposition, plaintiff waived only "any argument or claim that Defendant's counsel should be sanctioned for the Rule 4:15 violation" *Id.* at 186. This is consistent with the finding that, "[i]f counsel violates the reasonable effort to confer and certification requirements of Va. Sup. Ct. R. 4:15, then the appropriate remedy is to move the court to deny the motion for failure to follow the Rule or to ask the court not to hear the motion until the Rule's requirements are satisfied." *Id.*

MWV presented a copy of a June 7, 2013, letter from Joseph Hutchison, to Bates to which it appears the Complaint and the Motion for Temporary Injunction were attached. This letter not only informed Bates of MWV's suit and motion, but asked him to refrain from beginning or continuing his employment with GPI while the matter is pending and to preserve electronically stored information in his possession. MWV claims that it did not receive a response to this letter. MWV also states in its response that it conferred with defense counsel prior to scheduling the June 20, 2013, hearing. The court also notes that Bates was able to adequately respond to the motion for temporary injunction, having filed an memorandum in opposition of 37 pages, which far exceeds the 20-page limited imposed by the very same rule MWV is accused of violating. Va. Sup. Ct. R. 4:15(c).

The court finds that neither MWV nor Bates complied with Rule 4:15. Notwithstanding their failure to comply with the Rule, the court does not find that either party has been prejudiced by the procedural violation. Thus, the court will not decline to hear the merits of the Motion for Temporary Injunction based on the violations of Rule 4:15 identified by the parties. *See Shen Valley Masonry v. Thor, Inc.,* 81 Va. Cir. 89, 91 (Roanoke 2010).

### III. *Standard of Law*

#### A. *Temporary Injunction*

Before the court is MWV's Motion for Temporary Injunction. The Code of Virginia mandates that the award of an injunction is within the jurisdiction of the circuit court. Va. Code Ann. § 8.01-620. The Supreme Court of Virginia has held that "the granting of an injunction is an extraordinary remedy and rests on sound judicial discretion to be exercised upon consideration of the nature and circumstances of a particular case," *Preferred Systems Solutions, Inc. v. GP Consulting, L.L.C.,* 284 Va. 382, 401, 732 S.E.2d 676, 686 (2012) (quoting *Levisa Coal Co. v. Consolidation Coal Co.,* 276 Va. 44, 60, 662 S.E.2d 44, 53 (2008)), and that a plaintiff seeking permanent injunctive relief has the burden to demonstrate "irreparable harm and the lack of an adequate remedy at law." *Id.* (quoting *Black & White Cars, Inc. v. Groome Transp., Inc.,* 247 Va. 426, 431, 442 S.E.2d 391, 395 (1994)); see also *Levisa Coal Co.,* 276 Va. at 61, 662 S.E.2d at 53. However, the

Supreme Court has not established the standard for the issuance of a temporary injunction. As such, Virginia trial courts have adopted the four-part test as set forth by the Supreme Court of the United States and adopted by the Fourth Circuit. *See, e.g., McEachin v. Bolling*, 84 Va. Cir. 76, 77 (Richmond 2011) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)); *Dean v. Virginia High School League, Inc.*, 83 Va. Cir. 333, 334 (Norfolk 2011) (citing *Merrill, Lynch, Pierce, Fenner & Smith v. Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985)). This four-part test requires that the plaintiff "establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20; see also *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011); *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 2013 U.S. App. LEXIS 13606, *10 (July 3, 2013).

### B. *Misappropriation of a Trade Secret*

As held by the Supreme Court of Virginia, a claim for misappropriation of a trade secret must allege facts showing "(1) the existence of a trade secret, and (2) its misappropriation by the defendant." *Preferred Sys. Solutions, Inc.*, 284 Va. at 405, 732 S.E.2d at 688 (citing *MicroStrategy, Inc. v. Li*, 268 Va. 249, 263, 601 S.E.2d 580, 588 (2004). The determinations as to the existence of a trade secret and whether a trade secret has been misappropriated are questions of fact. *MicroStrategy, Inc.*, 268 Va. at 264-65, 601 S.E.2d at 589.

Section 59.1-336 of the Code of Virginia defines misappropriation to mean:

1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

· 2. Disclosure or use of a trade secret of another without express or implied consent by a person who:

a. Used improper means to acquire knowledge of the trade secret; or

b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(1) Derived from or through a person who had utilized improper means to acquire it;

(2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(4) Acquired by accident or mistake.

Va. Code Ann. § 59.1-336.

Section 59.1-336 of the Code of Virginia also defines the term "trade secret," but as Defendant does not contest that MWV possesses trade secrets, or confidential information, the court need not evaluate this factor in its analysis for the claim of misappropriation of the trade secret.

## C. *Injunction for Actual or Threatened Misappropriation of a Trade Secret*

Code of Virginia § 59.1-337 provides that "[a]ctual or threatened misappropriation may be enjoined." Va. Code Ann. § 59.1-337(A). However, "[m]ere knowledge of trade secrets is insufficient to support an injunction under the terms of Code Ann. § 59.1-337." *Motion Control Sys., Inc. v. East*, 262 Va. 33, 38, 546 S.E.2d 424, 426 (2001).

The matter before the court presents the question of whether the inevitable disclosure doctrine is a recognized legal doctrine in Virginia. This doctrine holds that an employer may enjoin an employee who has knowledge of a trade secret from accepting employment with a direct competitor if the employee will necessarily have to use or otherwise disclose those trade secrets to perform the duties of his new position. *Nucor Corp. v. Bell*, No. 2:06-CV-02972-DCN, 2008 U.S. Dist. LEXIS 119952, (U.S. Dist. S.C. March 14, 2008). The United States District Court for the Southern District of Florida noted in *Del Monte Fresh Produce Co. v. Dole Food Co.*, concern over whether to treat inevitable disclosure and threatened disclosure as distinct theories or if inevitable disclosure is a way to determine threatened disclosure. 148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001). The Virginia Uniform Trade Secrets Act is clear as to what constitutes misappropriation and what type of misappropriation may be enjoined. Va. Code Ann. § 59.1-337(A) (limiting an injunction to either actual or threatened misappropriation). Coupled with MWV's argument that the inevitable disclosure doctrine as "a logical interpretation of the term 'threatened misappropriation'," that is a "common sense tool" to consider in determining threatened misappropriation and recent case law, the court will limit its evaluation of inevitable disclosure to its treatment as a way to prove threatened misappropriation. Plaintiff MeadWestvaco's Memorandum of Law in Support of its Motion for Temporary Injunction, § III(B)(2), pp. 17-18; see *Nucor Corp.*, No. 2:06-CV-02972-DCN, 2008 U.S. Dist. LEXIS 119952.

To support the argument that Virginia would apply the inevitable disclosure doctrine, MWV cites *Dionne v. Southeast Foam Converting & Packaging, Inc.*, 240 Va. 297, 397 S.E.2d 110 (1990), in which the Supreme Court of Virginia enjoined a defendant from his future plan to start a new business based on his threats of misappropriation. In *Dionne*, the former employer held a patent to a packaging material unlike any other on the

market, and, following a dispute, the defendant left and informed suppliers and customers that he intended to form a new company that would develop a similar product but in a more cost effective manner. *Id.* at 301, 397 S.E.2d at 112. This case is instructive on granting an injunction on threatened misappropriation, but the court does not agree with MWV's assertion that this case is analogous to a fact pattern giving rise to the inevitable disclosure doctrine. Rather, the facts in *Dionne*, the fact that there was a one of a kind product, a disgruntled former employee who helped design the patented product, and communication with customers about his intent to start a new company, demonstrate a case of a direct threat to misappropriate. See *id.* at 300-01, 397 S.E.2d at 111-12.

Bates argues that threatened misappropriation must come in the form of an actual or direct threat. To support this contention, he cites *Government Tech. Servs., Inc. v. Intellisys Tech. Corp.*, 51 Va. Cir. 55 (1999), in which the Fairfax County Circuit Court sustained the defendant's demurrer because the "[p]laintiff failed [to allege direct or indirect disclosure of any confidential information to [Intellisys Technology Corporation], but rather states there was an 'inevitable' or conclusory disclosure," and that the Virginia Trade Secrets Act mandates that "only actual or threatened misappropriation may be enjoined." *Id.* 55-56. The opinion goes on to observe "Virginia does not recognize the inevitable disclosure doctrine." *Id.* at 56. However, while the Fairfax County Circuit Court was correct at the time in finding that Virginia does not recognize the inevitable disclosure doctrine, this court notes that the finding is persuasive and that [non] recognition is not akin to rejection.

Bates also cites to *Motion Control Systems, Inc. v. East*, 262 Va. 33, 546 S.E.2d 424 (2001). In this case the defendant received several promotions during his seven-year employment with the plaintiff, and, in rising to a managerial position, had access to new product development, customer lists, and customer specifications. *Id.* at 35, 546 S.E.2d at 425. Shortly after signing a non-compete and confidentiality agreement, the defendant went to work for a company that "made some of the same products." *Id.* at 36, 546 S.E.2d at 425. The trial court found that the defendant had knowledge of trade secrets, and that the plaintiff had reasonable concern the new company would begin producing plaintiff's product and end its business. *Id.* Ultimately, the trial court enjoined the defendant from disclosing trade secrets or other confidential information. *Id.* at 38, 546 S.E.2d at 426. The Supreme Court of Virginia found that "[T]he only basis cited by the trial court for issuing the injunction was that [defendant] had knowledge of the trade secrets. . . . The trial court made no findings that [defendant] had actually disclosed or threatened to disclose such information." *Id.* The Court concluded its analysis acknowledging that "[m]ere knowledge of trade secrets is insufficient to support an injunction under the terms of Code § 59.1-337." *Id.* On this basis, the Court reversed the trial court's ruling as it pertained to imposing an injunction. *Id.*

While the facts in *Motion Control Systems* are similar to those in the matter before the court, the injunction is different. The Court in *Motion Control Systems* evaluated the trial court's decision to enjoin the disclosure of trade secrets and confidential information. Here, the court has also been tasked with the question of whether to enjoin Bates from working for GPI.

The Virginia caselaw cited by both parties, while helpful, does not resolve the question of inevitable disclosure before the court. While *Dionne*, *Motion Control Systems*, and *Government Technology Services* affirm that either actual or threatened misappropriation is required, none of the cases define the scope of threatened misappropriation. *Government Technology Services* does find that the inevitable disclosure doctrine is not recognized in Virginia, but again, this finding is persuasive, not mandatory. *Government Tech. Servs., Inc.*, 51 Va. Cir. at 56. Virginia's Uniform Trade Secrets Act, like the other states adopting similar acts, does not address the concept of inevitable disclosure. But this does not serve as the dispositive factor in deciding the issue of inevitable disclosure, as several states with similar trade secrets acts have adopted the doctrine. Thus, to aid in resolving the issue, the court turns to other state and federal courts for guidance.

In *Nucor Corporation*, the South Carolina District Court predicted whether the inevitable disclosure doctrine would fall under § 39-8-50(A) of the South Carolina Trade Secrets Act. Just like Virginia Code § 59.1-337, the South Carolina code section authorized injunctive relief for "actual or threatened misappropriation." S.C. Code Ann. § 39-8-50(A); see *Nucor Corp.*, No. 2:06-CV-02972-DCN, 2008 U.S. Dist. LEXIS 119952, at *50. In its analysis, the District Court found that a majority of the states have adopted statutes that authorize injunctions for threatened misappropriation, and that "[s]tate or federal courts in at least fifteen of those states . . . have applied the inevitable disclosure doctrine," with at least two state appellate courts rejecting inevitable disclosure, and the remaining states having not addressed the doctrine. *Nucor Corp.*, No. 2:06-CV:02972-DCN, 2008 U.S. Dist. LEXIS 119952, at *51. In adopting the doctrine, the court noted that the South Carolina code permitted injunction for threatened misappropriation and "[t]he inevitable disclosure doctrine is a common-sense tool for determining when misappropriation is likely to occur," that most states to analyze the inevitable disclosure have adopted it in some manner, states similar to South Carolina in disfavoring restraint of trade have adopted the doctrine, and, because the chief state to reject it, California, has a incredibly rigid position against trade restraints. *Id.* at *55-56.

Rather than restating the District Court's analysis word for word, the court instead will focus on *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 125 Cal. Rptr. 2d 277 (2002), and its reasoning for rejecting the doctrine.

The court notes that other courts have found California's reasoning persuasive when addressing the doctrine. *E.g. Lejeune v. Coin Acceptors,*

*Inc.*, 381 Md. 288, 322, 849 A.2d 451, 471 (Md. 2004) (declining to apply the inevitable disclosure doctrine, finding the California court's reasoning "persuasive, especially as applied to the circumstances in the case before [the court]."); *Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326, 1337 (S.D. Fla. 2001) (finding that "a court should not allow a plaintiff to use inevitable disclosure as an after-the-fact non-compete agreement to enjoin an employee from working for the employer of his or her choice"); *IBM Corp. v. Seagate Tech., Inc.*, 941 F. Supp 98, 101 (D. Minn. 1992) (holding that, "in the absence of a covenant not to compete or a finding of actual or an intent to disclose trade secrets, employees 'may pursue their chosen field of endeavor in direct competition' " and that "[m]erely possessing trade secrets and holding a comparable position with a competitor does not justify an injunction. A claim of trade secret misappropriation should not act as an *ex post facto* covenant not to compete"). Importantly, these cases share the common fact that the former employee did not sign a non-compete agreement with the former employer. *E.g. Lejeune*, 381 Md. at 295, 849 A.2d at 455 (former employee and former employer did not enter into either a confidentiality agreement nor a non-compete agreement; *Del Monte Fresh Produce*, 148 F. Supp. 2d at 1329-30 (former employee and former employer entered into a confidentiality agreement, but, "[a]t no time during his employment with [former employer], did [former employee] enter into a non-compete agreement with [former employer]").

The California court found that the result of the inevitable disclosure doctrine "is not merely an injunction against the use of trade secrets, but an injunction restricting employment." *Whyte*, 101 Cal. App. 4th at 1462, 125 Cal. Rptr. 2d at 292. The court's chief complaint with the doctrine rested in its after-the-fact nature of imposing a covenant not to compete, which "alters the employment relationship without the employee's consent." *Id.* at 1462-63, 125 Cal. Rptr. 2d at 292. Thus, the inevitable disclosure doctrine grants the employer "the benefit of a contractual provision it did not bargain for, while the employee is bound by a court-imposed contract provision with no opportunity to negotiate terms or consideration." *Id.* at 1463, 125 Cal. Rptr. 2d at 293.

While the facts of the case before the court are similar to those of the cases before the California court rejecting inevitable disclosure, there remains a significant difference that bears mentioning. MWV and Bates entered into both a confidentiality agreement and non-compete agreement, but the former employer and former employee in *Whyte* entered into a confidentiality agreement only. *Whyte*, 101 Cal. App. 4th at 1447, 125 Cal. Rptr. 2d at 281. Thus, as applied to the present case, the chief concern as identified by the California court rejecting the inevitable disclosure doctrine, an after-the-fact non-compete agreement, would be of no issue if

one or both of the non-compete agreements between MWV and Bates are valid.

MWV also cites *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), in support of its argument. In *PepsiCo*, PepsiCo and Quaker were direct competitors, particularly in the beverage industry and the sports drinks market. *Id.* at 1264. The defendant held a high-level position that allowed him access to confidential information and trade secrets, including pricing methods, strategic plans, and "attack plans," which MWV analogizes to its innovation projects designed to respond to GPI products. *Id.* at 1264-65. A significant difference between the facts of *PepsiCo* and the facts here is that, like *Whyte* and *Lejeune*, the parties in *PepsiCo* did not enter into a non-compete agreement (although they had entered into a confidentiality agreement). *Id.* 1264.

The Seventh Circuit noted that there was little law establishing what constitutes threatened disclosure or inevitable disclosure, but cited to Illinois case law, from which one could infer inevitable disclosure would establish threatened misappropriation. *Id.* at 1268-69. The court held that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's now employment will inevitably lead him to rely on the plaintiff's trade secrets." *Id.* at 1269. Noting "the mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose . . . trade secret information'," the court identified six factors should be considered before applying the inevitable disclosure doctrine. *Id.* at 1269-72 (quoting *AMP, Inc. v. Fleischhacker*, 823 F.2d 1199, 1207 (7th Cir. 1987)). These six factors, adopted by the court in *Nucor*, are as follows:

> (1) whether the former employer possesses a "trade secret," (2) the employee's position at his former employer; (3) whether the employee possesses an "extensive and intimate knowledge" of his former employer's trade secrets; (4) the degree to which the employee's former employer and new employer are in competition; (5) whether the employee can effectively perform the duties of his new position without disclosing, using, or relying on his former employer's trade secrets; (6) whether there are other circumstances that indicate the employee or his new employer are unable or unwilling to safeguard the former employer's trade secrets.

*Nucor Corp. v. Bell*, No. 2:06-CV-02972-DCN, 2008 U.S. Dist. LEXIS 119952, at *60-61, (U.S. Dist. S.C. March 14, 2008) (citing *PepsiCo., Inc.*, 54 F.3d at 1270-72).

Bates cites several cases, including *Whyte v. Schlage Lock Co.* and the cases identified above. As the court has already addressed the central component these courts identified in rejecting inevitable disclosure, no

further discussion is needed. Bates' argument that Georgia law applies, and his analysis of the applicability of inevitable disclosure there is dealt with later in this opinion.

The court finds that, because Bates and MWV entered into confidentiality agreements, non-compete and non-solicitation agreements, the central concern announced by courts rejecting the inevitable disclosure doctrine, namely the creation of an *ex post facto* covenant not to compete is not at issue, making it more favorable to apply the inevitable disclosure doctrine in this case. Furthermore, the court finds that the same factors the district court in *Nucor Corp.* considered are applicable to Virginia. Va. Code § 59.1-337 permits injunctions in cases of threatened misappropriation; pursuant to the parties' memoranda and the research performed by the district court, the court agrees that, of the states to consider the inevitable disclosure doctrine, a majority of them have adopted it in some form; a brief survey of caselaw shows that Virginia often looks to the majority of states in deciding legal issues. See, *e.g., Board of Supervisors v. Board of Zoning Appeals*, 268 Va. 441, 446, 604 S.E.2d 7, 9 (2004) ("[A] board of supervisors is an aggrieved person within the meaning of Va. Code § 15.2-2314, and thus has standing to challenge a decision of a BZA. This holding is consistent with the majority rule adopted by our sister states."); *Coleman v. Hogan*, 254 Va. 64, 67, 486 S.E.2d 548, 549 (1997) (agreeing with the majority of states that, when tasked with "prescribing the appropriate remedy for the unconstitutional exercise of a peremptory strike . . . the choice of remedy should be within the discretion of the trial court"); *Dickson v. Dickson*, 23 Va. App. 73, 84, 474 S.E.2d 165, 171 (1996) (agreeing "with the majority of states that the discharge in bankruptcy of a property settlement agreement or equitable distribution award may be considered as a change in circumstances justifying the modification of spousal support obligation"); and other states with policy interests disfavoring trade restrictions have adopted inevitable disclosure.

In light of the foregoing, the court finds that, under the present circumstances, in which the parties previously entered a non-compete agreement and that thus there is no concern about an after-the-fact creation of such a restriction, Virginia would likely apply the doctrine of inevitable disclosure to determine whether threatened misappropriation exists, assuming the non-compete is enforceable. *See* the court's discussion of the restrictive covenants under section IV(B) of this opinion.

## D. *Breach of Contract of Restrictive Covenants*

"Restraints on trade are not favored in Virginia; hence, contracts in restraint of trade are enforceable only if 'narrowly drawn to protect the employer's legitimate business interest; . . . not unduly burdensome on the employee's ability to earn a living, and . . . not against public policy'." *Preferred Sys. Solutions, Inc.*, 284 Va. at 393, 732 S.E.2d at 681 (quoting

*Omniplex World Servs. Corp. v. US Investigations Servs.*, 270 Va. 246, 249, 618 S.E.2d 340, 342 (2005)). The plaintiff bears the burden of proof, and the court considers "the function, geographic scope, and duration of the restriction" when analyzing the factors. *Id.* (citations omitted).

The Supreme Court of Virginia has found non-competition agreements to be justified when there has been personal contact between an employee and the employer's customers. *Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick*, 239 Va. 369, 372, 389 S.E.2d 467, 469 (1990). A non-compete "covenant must be strictly construed and, if ambiguous, it must be construed in favor of the employee." *Motion Control Sys., Inc.*, 262 Va. at 37, 546 S.E.2d at 426. Virginia applies the same test to non-solicitation agreements and confidentiality agreements as it does to non-compete agreements. *Lasership, Inc. v. Watson*, 79 Va. Cir. 205, 214-15 (Fairfax County 2009).

## E. *Violation of the Virginia Computer Crimes Act*

Count IV of the Complaint alleges a violation of the Computer Crimes Act. MWV does not argue this claim as a basis for its temporary injunction. In fact, nowhere in its Motion for Temporary Injunction is the alleged violation of the Computer Crimes Act mentioned. Thus, while Defendant raised this issue in his memorandum in opposition to Plaintiff's motion, arguing that it cannot stand as an independent basis for injunctive relief, the court declines to address the alleged violation of the Virginia Computer Crimes Act in its analysis of Plaintiff's motion for a temporary injunction.

## IV. *Analysis*

### A. *Actual or Threatened Misappropriation*

#### 1. *Whether Georgia or Virginia Law Governs*

Bates argues that Virginia law is inapplicable to a claim for threatened misappropriation of trade secrets. Rather, Georgia law applies because the alleged misappropriation in this case would occur in Georgia, where he will work for GPI. Applying Virginia choice of law rules, Bates cites *Dreer v. Budget Rent-A-Car Sys., Inc.*, for the holding that, in tort claims, the doctrine of *lex loci delicti*, "meaning the law of the place of the wrong" applies. 272 Va. 390, 395, 634 S.E.2d 324, 327 (2006). MWV's response notes that the claim arises under statute, not tort, and thus Virginia law applies. Moreover, even under the choice of law for tort, Virginia law applies because Virginia is the place of the wrong. To support this contention, MWV points to the evidence that Bates signed restrictive covenants in Virginia, he most recently worked for MWV in Virginia, and he learned of MWV's trade secrets in Virginia.

The court is not persuaded by Bates' argument that Georgia law applies. Because the matter concerns threatened misappropriation based off of the inevitable disclosure doctrine, the act of accepting employment with GPI would constitute the wrong. Thus, Virginia law would apply because Bates accepted employment while in Virginia, while still a resident of Virginia, allegedly in violation of a Virginia statute, and against a Virginia corporation.

## 2. Likelihood of Success on the Merits

As previously stated, there is no disagreement that MWV has trade secrets and confidential information and that Bates had access to and knowledge of this sensitive information. Thus, to determine the likelihood MWV will succeed on the merits of its claim for misappropriation of trade secrets, the court must determine whether there has been misappropriation, which may be either actual or threatened.

MWV did not present evidence that Bates actually used or disclosed MWV's trade secrets. Rather, it argues that Bates has engaged in threatened misappropriation because he will inevitably disclose this confidential information in his position at GPI. Because the court has determined that Virginia would likely apply the inevitable disclosure doctrine in such a case where there is both a confidentiality agreement and a non-compete agreement, to determine whether threatened misappropriation by inevitable disclosure exists, the court will evaluate the six factors set forth in the *PepsiCo* decision and adopted by the court in *Nucor Corporation*.

### a. Whether MWV Possesses a Trade Secret

The parties do not disagree that MWV possesses trade secrets and other confidential information. The court so finds.

### b. Bates' Position at MWV

As the Senior Director of Global Production Design, Bates held the highest level design position at MWV. The difficulty before the court is that Bates and MWV strongly disagree as to the scope of his responsibilities while holding this position. To resolve these conflicting accounts, the court has reviewed the evidence and testimony, and has had to make certain determinations as to credibility.

Martin, who provided a detailed account of Bates' duties at MWV, admittedly spent just 5% of his time in direct contact with Bates. Along with the frequent side bars and hallway discussions, this may have been enough time to observe Bates engage in several of these functions, but it may not have been enough to accurately gauge just how much time Bates devoted to a particular responsibility. Thus, it is hard to say that the functions Martin

identified were all primary responsibilities or whether Bates dabbled in a particular area on the rare or even singular occasion.

The testimony and evidence from Bates, on the other hand, attempts to seriously underplay his role at MWV. His testimony paints the picture that his work was strictly limited to the contemplation of design ideas, the physical creation of those ideas, and organization within design. According to his testimony, the customers would identify their needs and a different team would craft a strategic plan, and, from this design, would produce an output. However, common sense dictates that the design process is more likely to be collaborative than simply reactionary. It is difficult to believe that there would be limited customer interaction in the design process or that communication of customer needs would run through a separate department; to do so would be highly inefficient.

Other evidence presented at the hearing shows that Bates' responsibilities went beyond those he identified in his testimony. Plaintiff's Exhibit 3 indicates that, at times, Bates was called upon to brain storm ideas to compete with GPI's and other competitor's products. While he may not have been the only individual asked to craft responses to new products, he clearly was associated with business strategy and innovation. Furthermore, Bates himself testified to flying to the United Kingdom to meet with Coca-Cola to discuss the facilities' needs and with the ultimate goal of securing more business. The court does not believe that any company would send one of its employees with, as Bates testified, limited client interaction to travel overseas to meet with and attempt to garner additional business from such a noteworthy client.

The court finds the evidence as to Bates' responsibilities with GPI informative with respect to this factor. As Vice President of Global Designs, Bates will be responsible for leading and shaping GPI's global design organization, but his testimony provided very little specificity as to his duties beyond forming third-party relationships, supervising the supervisors of designers, and generally assuring that the design process is followed. Rather, his testimony focused on the duties he will not perform. It was only during cross-examination that Bates acknowledged he, in his role as supervisor of the supervisors, may be presented with specific design issues or projects. The court finds that this function is not simply a possibility, but a certainty. It is unrealistic to believe that an individual charged with supervising those tasked with supervising design work will not have involvement in packaging, strategy, and formulation on some level, particularly when design issues arise that require some form of executive directive on how to proceed.

Moreover, Bates' new position indicates that he has skills beyond those of design. A corporate vice president position charged with forming third-party relationships is not a position companies are likely to hand over to someone lacking the skill and experience to develop new customer

relationships. Thus, Bates must have developed these new customer skills while working with MWV. And given that such responsibility comes as one moves up the corporate hierarchy, it is more likely that Bates engaged in such client interaction later in his career at MWV than he did earlier in his career, leading the court to find that Bates was involved in customer interaction during the last few years of his employment with MWV.

Bates' testimony underplayed his role at MWV and was noticeably general and vague with regard to his responsibilities at GPI. In light of the evidence presented, the court finds that there is significant overlap of responsibilities associated with the two positions. For example, in both his role at MWV and his role with GPI, Bates oversaw, and will oversee, the organizational component of design. As such, it is clear by a preponderance of the evidence that Bates' responsibilities at MWV are more in line with the scope of the work Martin identified than the scope of work Bates identified.

### c. *Whether the Employee Possesses an "Extensive and Intimate Knowledge" of His Former Employer's Trade Secrets*

MWV claims that Bates had access to MWV's trade secrets, innovation pipeline, competitive strategies, and other confidential information. Bates does not challenge this claim. The court so finds.

### d. *The Degree to Which the Employee's Former Employer and New Employer Are in Competition*

Both MWV and GPI focus on food and beverage packaging and devote a significant degree of effort toward product innovation. They cater to and compete for the same customer base and are unique in the market place because they are involved in not only the design and manufacture, but the automation associated with the industry. As such, the court finds that MWV and GPI are direct, global competitors in a highly competitive industry.

### e. *Whether the Employee Can Effectively Perform the Duties of His New Position without Disclosing, Using, or Relying on His Former Employer's Trade Secrets*

Bates testified that he could perform the duties of his position with GPI without using or disclosing MWV's trade secrets or confidential information. However, as the court found under factor number two, there is significant overlap of the MWV and GPI positions. Because of this overlap, the court draws the inference that, notwithstanding Bates' belief that he can perform the duties of his position with GPI without using or disclosing MWV's trade secrets, Bates will necessarily have to use or disclosure MWV's trade secrets in his role as Vice President of Global Design.

### f. *Whether There Are Other Circumstances That Indicate the Employee or His New Employer Are Unable or Unwilling To Safeguard the Former Employer's Trade Secrets*

The evidence here does not present the type of overt actions before the *Nucor* court, i.e. taking company documents, acting in bad faith by destroying the thumb drive containing those documents prior to review, spoliation. *Nucor Corp. v. Bell*, No. 2:06-CV-02972-DCN, 2008 U.S. Dist. LEXIS 119952, *66-67 (US. Dist. S.C. March 14, 2008). Yet, when looking at all of the evidence together, it is clear that Bates' position with GPI will entail many of the same responsibilities he performed at MWV. As such, the court finds by a preponderance of the evidence that Bates will be unable to maintain MWV's trade secrets and that there is a threat of misappropriation as demonstrated by application of the inevitable disclosure doctrine.

A review of this factor also warrants mention of Bates' failure to sign the Intellectual Property agreement despite multiple email requests and his failure to comply with the request to review and respond to a GPI product. These occurrences do not lead the court to find that Bates or GPI are unwilling to safeguard MWV's trade secrets; in fact, there may be valid explanations, such as Bates' decision not to sign the agreement because he disagreed with its language. However, the fact that Bates was already in discussions with GPI at the time these requests came to him does not escape the court's attention.

### 3. *Likelihood of Irreparable Harm*

A plaintiff must clearly show "he is likely to suffer irreparable harm in the absence of preliminary relief." *McEachin v. Bolling*, 84 Va. Cir. 76, 81 (Richmond 2011). The true value of a trade secret lies in its secrecy, not its novelty. *Am-Cor.com, Inc. v. Stevens*, 56 Va. Cir. 245, 250 (Warren County 2001). Thus, it is of no surprise that courts have found the loss of trade secrets to result in irreparable harm. *Home Funding Group, L.L.C. v. Myers*, 2006 U.S. Dist. LEXIS 90285, at *5 (E.D. Va. 2006) (finding that "[t]he disclosure of trade secrets establishes immediate irreparable harm because "a trade secret, once lost is, of course, lost forever") (citation omitted).

Bates argues that, in the present case, there is no likelihood of irreparable harm because there has been no disclosure. He cites to the *Motion Control Systems* case, in which the court found that "[m]ere knowledge of trade secrets is insufficient to support an injunction under the terms of Code § 59.1-337." *Motion Control Sys., Inc. v. East*, 262 Va. 33, 38, 546 S.E.2d 424, 426 (2001). However, this argument rests on the premise that the inevitable disclosure doctrine does not apply, which is contrary to the court's finding set forth above. Thus, while there is no evidence of actual disclosure, the court has found evidence of threatened disclosure though the inevitable disclosure doctrine. Considering the existence of threatened

disclosure and the all or nothing nature of trade secrets, the court finds the evidence to show MWV is likely to suffer irreparable harm unless an injunction is issued.

### 4. *Balance of the Equities*

Because MWV is likely to suffer irreparable harm in the absence of an injunction, the court finds that the balance of the equities is in its favor. The fact that Bates has left his position with MWV and moved his family to Georgia to begin working for GPI is not lost on the court. However, the evidence shows that Bates received multiple job offers in addition to the GPI offer, including an offer from MWV to match GPI's offer. Despite these offers, Bates deliberately took a similar position with one of MWV's direct competitors. Coupled with a secured bond pending the outcome of the trial, the court finds that the potential harm to MWV in not issuing an injunction exceeds the potential harm to Bates if he is enjoined from working for GPI.

### 5. *Public Interest*

Public interest is served by protecting trade secrets and confidential information from misappropriation. *See Dionne v. Southeast Foam Converting & Packaging, Inc.*, 240 Va. 297, 304, 397 S.E.2d 110, 114 (1990). The best evidence of this interest is in the legislature's adoption of the Virginia Uniform Trade Secrets Act. *Id.* Therefore, public interest favors granting an injunction.

### B. *The 2012 Stock Award Agreements*

#### 1. *Enforceable under Virginia Law*

Bates contends that, because the 2012 Stock Award Agreements do not contain any signature by either Bates or MWV, they are not valid and thus unenforceable. In his response to Teresa Gran's affidavit, Bates argues that her affidavit fails to show these procedures were followed when Bates accepted his grants. He points to the lack of documentation demonstrating that he indeed accepted these terms, noting that the exhibits attached to her affidavit are examples of the screens an employee would see during this process, and are not specific to Bates.

The evidence before the court comes from the Affidavit of Teresa Gran, the Stock Plan Administrator for MWV, the Affidavit of Aaron L. Bates, and the Supplemental Affidavit of Aaron L. Bates. In her affidavit, Teresa Gran affirms that, in order to accept the long-term incentive grant, Bates and all other eligible MWV employees had to log onto their accounts, navigate the Action Center, click the "Accept Your Grant" link, select the radial button

of the corresponding grant to be accepted, and then click "continue." Gran Aff. 2. The employee would then view the Grant Documents page, which requires the employee to either accept or reject the Grant Documents. *Id.* at 3. Should the employee accept the documents, he acknowledges and agrees to the terms and conditions of the award. The employee must then re-enter his login information in order to submit and complete the acceptance. *Id.* at 4. Bates' affidavit and his supplemental affidavit simply state that he does not recall signing the documents and that he did not recall agreeing to any terms or conditions when accepting stock awards in the past. Bates Aff. 7; Bates Supp. Aff. 1-2.

The court does not find merit in Bates' argument. Bates acknowledges that he received the stock option awards, and it is clear from the evidence that, if Bates received the benefits, he accepted the conditions. Bates Supp. Aff. 2; *see A. V. v. iParadigms*, 544 F. Supp. 2d 473 (E.D. Va. 2008). Moreover, if the matter before the court concerned Bates' attempt to enforce the 2012 Stock Award Agreements, the court does not believe Bates would argue he did not sign the agreements, despite the lack of his actual signature.

### 2. *Injunctive Relief Permitted*

Without citing any supporting law, Bates argues that, because injunctive relief is not identified as an available remedy under the terms of the 2012 Stock Award Agreements, it is, therefore, not permitted for the breach of contract claim. Additionally, Bates alleges that, in addition to the 2012 stock grants, MWV has revoked close to $200,000.00 in prior grant awards. Bates contends that this revocation demonstrates that MWV determined the value of monetary compensation to remedy any harm, and thus the motion for injunctive relief should be denied. MWV argues that the competitive value of its trade secrets and other confidential information cannot be readily quantified.

Bates second argument concerning the approximately $200,000.00 in rescinded grant awards was made as part of his response to the affidavit of Teresa Gran, to which MWV has not yet had the opportunity to respond. However, the court is able to address this argument absent MWV's response.

The court does not find merit in Bates argument. While the provision of the 2012 Stock Award Agreements stating that MWV may rescind the stock award grants does not specifically identify temporary injunction as a remedy for breach, this provision does not purport to set forth an exhaustive list of available remedies. Bates' argument boils down to the notion that, because a remedy is not listed, it is not available. To find so would effectively allow an employee to breach the non-compete and non-solicitation clauses with little consequence, forfeiture of the stock awards, and effectively render such clauses meaningless.

## 3. Likelihood of Success on the Merits

### a. Narrowly Drawn To Protect a Legitimate Business Interest

Bates does not contest MWV's claim that it has a legitimate business interest in protecting its confidential information and its customer relationships. As such, the court finds that MWV has a legitimate business interest. "Each non-competition agreement must be evaluated on its own merits, balancing the provisions of the contract with the circumstances of the businesses and employees involved." *Omniplex World Servs. Corp. v. US. Investigations Servs., Inc.*, 270 Va. 246, 249, 618 S.E.2d 340, 342 (2005). A non-compete restriction "is functionally overbroad and unenforceable if it prevents an employee from working for companies not in competition with the former employer or it prevents an employee from pursuing non-competing employment positions." *Lasership, Inc. v. Watson*, 79 Va. Cir. 205, 212 (Fairfax County 2009). However, "[a]greements that prohibit employees from taking specified, competing positions with 'any competitor of the employer' or with a business that provides 'the same or similar services' as the employer have been upheld." *Id.* at 211-12 (citation omitted). "[W]hen the competition at issue is direct and the agreements are narrowly drawn to prohibit such direct competition, the non-competition agreements are more likely to be enforceable." *Market Access Int'l, Inc. v. KMD Media, L.L.C.*, 72 Va. Cir. 355, 360 (Fairfax County 2006).

A review of the 212 Stock Award Agreements shows that the non-competition clause (and the non-solicitation clause) imposes a restriction period of twelve-months following the termination of employment. During his employment and the twelve-month restriction period, Bates will not "anywhere in the world where [MWV] or its affiliates do business, directly or indirectly . . . provide services as an employee . . . to any business that competes with [MWV] and its affiliates in businesses in which [Bates] was materially involved during the two years prior to [his] termination." MeadWestvaco Corp. Stock Option Awards (for 2012), Ex. A.

Bates argues that the functional scope and geographic scope of the non-compete restriction are not narrowly tailored. Specifically, the functional scope does not specify the competing positions that Bates is prohibited from performing, and the scope of "anywhere in the world where [MWV] or its affiliates do business, directly or indirectly," is geographically broad and ambiguous because it requires Bates to ascertain everywhere MWV conducted business and imposes upon him the responsibility to determine where MWV indirectly conducts its business.

Bates did not challenge the agreements as being unduly burdensome. Nor did Bates challenge the non-solicitation agreement or confidentiality agreement

The court finds that the functional and geographic restrictions of the non-compete are narrowly tailored to protect MWV's legitimate business interest. The restrictions contain key language, as pointed out by MWV, that limit the non-compete to businesses that compete with MWV and its affiliates in business in which Bates was materially involved. This language limits the restriction to businesses that actually compete with MWV. See *Lasership, Inc. v. Watson*, 79 Va. Cir. 205, 214 (Fairfax County 2009); *cf. Motion Control Sys. v. East*, 262 Va. 33, 38, 546 S.E.2d 424, 426 (2001) (holding that a non-compete restricting employment in a "similar business" was not narrowly tailored to protect a legitimate business interest). Moreover, restricting the function to that in which Bates was materially involved limits the prohibited activity to those functions Bates performed for MWV in the past two years, not "any position with a competitor" as Bates claims. As stated in *Lasership, Inc. v. Watson*, "[a] covenant not to compete is functionally overbroad and unenforceable if it prevents an employee from working for companies not in competition with the former employer or it prevents an employee from pursuing non-competing employment positions with any employer." 79 Va. Cir. 205, 212 (Fairfax County 2009). That is simply not the case here.

The evidence is clear that MWV is a global business that competes with GPI on a global level. Importantly, the restriction against doing business anywhere in the world where MWV does business is not geographically unlimited. MWV's reach, while great, does not blanket the earth. Regardless, "[t]he mere fact that there is no geographic limitation is not fatal to the enforceability of [a] non-compete agreement." *Market Access Int'l, Inc.*, 72 Va. Cir. at 359. Finally, the court does not find that the use of the term "indirectly" causes the state of consternation that Bates claims. In fact, Virginia courts have found a non-compete agreement prohibiting an employee from competing with the employer either directly or indirectly upon his termination to be enforceable. *E.g. Market Access Int'l, Inc.*, 72 Va. Cir. at 356, 360; *Brenco Enters. v. Takeout Taxi Franchising Sys.*, 2003 Va. Cir. LEXIS 86, 71 (Fairfax County 2003).

The non-compete clause set forth a restriction of short duration that is limited to functions in which Bates was materially involved and applicable only against businesses in competition with MWV. Geographically, the global restriction is not equivalent to an unlimited restriction, and, when evaluated together with the restrictions on function and duration, the court finds that the non-compete clause is narrowly tailored to protect a legitimate business interest.

### b. *Not Unduly Burdensome*

MWV contends that the restrictive covenants are not unduly burdensome on Bates' ability to earn a living in light of his admission to having two other outstanding offers in addition to the Vice Presidency position with

GPI, and MWV's offer to match. Bates offers no argument to challenge this assertion.

Taking into account the function, geographic scope, and duration of the restriction, the evidence that Bates received employment offers in addition to the offer from GPI, and the omission of any challenge to the contrary, the court finds that the restrictions in the 2012 Stock Award Agreements are not unduly burdensome.

### c. Public Policy

While Virginia disfavors covenants in restraint of trade, public policy favors the enforcement of valid contracts. *See Shuttleworth, Ruloff & Giordano, P.C. v. Nutter*, 254 Va. 494, 497-98, 493 S.E.2d 364, 366 (1997); *Devnew v. Flagship Group, Ltd.*, 75 Va. Cir. 436, 449 (Norfolk 2006). As such, [i]n cases where the employer's interests are strong, such as cases involving confidential information, a court will enforce a non-competition agreement. *Western Indus.-North, L.L.C. v. Lessard*, 2012 U.S. Dist. LEXIS 3869 at *11 (E.D. Va. March 21, 2012). As such, the court finds that the restrictions are not against public policy. `

### 4. Likely To Suffer Irreparable Harm

The court incorporates its findings set forth in section IV(A)(iii).

### 5. Balance of the Equities

The court incorporates its findings set forth in section IV(A)(iv).

### 6. Public Interest

Given that Bates and MWV entered into a valid agreement and that agreement was narrowly designed to protect MWV's interests, the court finds that public policy favors an injunction.

### C. 1992 Agreement

Bates argues that the 1992 Agreement is unenforceable for myriad reasons: MWV lacks standing to enforce an agreement entered into by its predecessor company, Mead; the 2012 Stock Award Agreements supersede the 1992 Agreement rendering in null and void; the 1992 Agreement should be governed by Georgia law, but, under either Georgia or Virginia law, the agreement would be found overly broad in function and geographic scope and thus unenforceable. However, because the court finds that the 2012 Stock Award Agreements are reasonable, valid, and enforceable and that Virginia would follow the majority of states in adopting the inevitable disclosure doctrine, the court need not address the 1992 Agreement for the purpose of issuing a temporary injunction.

## V. *Conclusion*

In light of the findings set forth above, the motion for temporary injunction for threatened misappropriation of trade secrets and for breach of restrictive covenant[1] is granted as follows: (1) Bates is temporarily enjoined from being employed by GPI or its affiliated companies or any other competitor of MWV in a position with similar duties and responsibilities to those he held for MWV in the business of designing, manufacturing, and selling paperboard packaging products and related machinery until the matters before the court are resolved, but not longer than a period of twelve months; (2) Bates is temporarily enjoined from directly or indirectly soliciting or attempting to solicit any employees of MWV until the matters before the court are resolved, but not longer than a period of twelve months; and, until further order of the court, (3) Bates is enjoined from directly or indirectly divulging or making use of MWV's trade secrets and confidential information; (4) Bates is ordered to preserve all information currently stored on his individual business and personal computers, network servers, mobile devices, and any information stored on back up tapes, which may be relevant to this matter, or which may be reasonably likely to lead to the discovery of relevant evidence; (5) Bates is ordered to return to MWV all copies in whatever form of any information of MWV, including but not limited to any information Bates wrote, copied, printed, or downloaded onto CD-ROMs, floppy disks, thumb or flash drives, cloud accounts, or any other computer media before he left MWV or which he in any way re-created after his departure from MWV; and (6) Bates is enjoined from engaging in unfair competition by using any of MWV's confidential and proprietary information.

Bates' motion to dismiss that was taken under advisement at the June 20, 2013, hearing is denied. The court requests that the parties set a hearing during which the court will hear argument on the issue of bond.

---

[1]  Only as to the 2012 Stock Award Agreements, as the court declined to address the 1992 Agreement for purposes of issuing a temporary injunction.